JOINER, Judge.
*396 Jovon Dwayne Gaston was convicted of murder made capital because it was committed during a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and during a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. During the penalty phase of Gaston's trial, the jury recommended by a vote of 10 to 2 that Gaston be sentenced to death. The circuit court followed the jury's recommendation, finding that the aggravating circumstances outweighed the mitigating circumstances in his case, and sentenced Gaston to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975.
Statement of Facts and Procedural History
The evidence adduced at trial established that, on April 20, 2011, Gaston and Tyrone Thompson were at a friend's house with Gaston's brother, Patrick Watkins, and Tyrone's girlfriend, Cheryl Bush. According to Cheryl Bush, throughout the night she saw Gaston and Tyrone "standing to the side" and "whispering" to each other. Eventually, Gaston, Watkins, Tyrone, and Bush left their friend's house, dropping Watkins off "on the east side" before taking Bush home. After dropping off Watkins and Bush, Tyrone telephoned Kevin Thompson[1] and asked if he could stop by Kevin's apartment that night. According to Kevin's sister, Rena Curry, Tyrone had known Kevin for many years and Kevin had been trying to "steer [Tyrone] on the right path" in life. (R. 909.)
Between 9:00 p.m. and 10:00 p.m., Kevin's neighbor, Martelli Smith, noticed "two African-American males and one Caucasian female" standing outside the apartment complex near Kevin's silver Honda Civic automobile. (R. 934-35, 937, 939, 1005.) According to Smith, one male was "kind of chubby," while the other was "small and small built." (R. 935.)
Around that time, Chris Wilkerson, Kevin's friend, was on the phone with Kevin. Wilkerson testified that he heard someone knock on Kevin's door and that he overheard Kevin say, "I didn't know all of these people were coming with you." (R. 923.) When the call suddenly disconnected, Wilkerson called Kevin back and Kevin told him that he would "call [him] right back." (R. 924.) Although Wilkerson continued to try to reach Kevin until 1:00 a.m., he testified that Kevin never answered his phone or called him back.
The next day, when Kevin failed to report for work at Wellborn Elementary School, his colleagues became worried, so his school principal sent a school resource officer to Kevin's apartment to check on him. Because the apartment belonged to Kevin's sister, Rena Curry, however, the resource officer telephoned her and told her that Kevin had not shown up for work that day. Rena called her mother, Frances Curry, and then tried to reach Kevin on his cellular phone. When she could not reach Kevin on his cellular phone, Rena drove to the apartment. Frances also drove to the apartment and took alternate routes to determine whether Kevin had an automobile accident.
When Rena and Frances arrived at Kevin's apartment, they noticed that he was not at home and that his car was gone. Rena and Frances found Kevin's front door unlocked, the lights and air conditioning on, and a lit candle that appeared to have burned all night. They also noticed that one of his shoes was outside on the ground and a "trail" or "skid mark" was nearby. (R. 716, 901, 943.) The matching shoe was found inside Kevin's apartment *397 by the front door. Kevin's mother telephoned the police.
Shortly thereafter, Cpl. Bill Deleon arrived at Kevin's apartment and noted that "[e]verything appeared to be normal" and that nothing inside the apartment was "ransacked." (R. 767, 773.) Cpl. Deleon testified that he remembered speaking with family members and neighbors but that he did not learn much other than someone mentioned that they had "heard something" the night before. (R. 768.)
Concerned that law-enforcement officials were not doing enough to locate her son, Frances continued her search for Kevin. During the course of her search, Frances contacted Kevin's bank and learned that several withdrawals had been made from Kevin's account the previous night at various automatic-teller machines ("ATM"). Frances again contacted the Jacksonville Police Department to inform them of the unusual bank-account activity.
Law-enforcement officers obtained surveillance footage from the credit unions and banks located in the Anniston and Jacksonville areas where unusual withdrawals had been made from Kevin's account. That footage revealed that Kevin's debit card was first used at 10:19 p.m. on April 20, 2011, at a drive-up ATM in Jacksonville. The driver, later identified as Nicholas Smith, wore a baseball cap with the letter "A," had a tattoo on his hand, and was driving Kevin's silver Honda Civic. (R. 964.) The passenger, whom Gaston later identified as himself, was dressed in a navy hoodie and white hat, was wearing a gold six-point star ring, and was holding a rifle with a camouflage pattern pointed at the backseat. Smith made "nine or ten" attempts to withdraw money before he succeeded. (R. 964-65.) He then made four successive $100 withdrawals, leaving a balance of approximately $80 in Kevin's account. The footage showed Smith passing money to Gaston, who passed it to someone in the backseat. (R. 967.)
Six minutes later, Smith drove across the road to the drive-up ATM at the Fort McClellan Credit Union. Photographs from the Anniston branch of the Fort McClellan Credit Union showed that a silver vehicle and a dark-colored sport-utility vehicle arrived at 12:13 a.m. on April 21, 2011. Smith and a second individual were shown at the ATM. (R. 954, 956.) Rena later recognized Tyrone as the second man in the footage. Police interviewed Tyrone on April 21, 2011, but Tyrone admitted only that he met Smith at the credit union after Smith called to ask Tyrone "how to use a debit card at the ATM." (R. 146-47.) Tyrone denied any knowledge of Kevin's disappearance.
According to testimony at trial given by Whitney Ledlow and Jessica Foster, Smith then went to the apartment shared by both Ledlow and Foster. Ledlow and Foster testified that, when Smith arrived at their apartment, he had a "gash" on his face. (R. 1092, 1122.) Both women testified that they saw blood inside Smith's Ford Explorer sport-utility vehicle when they left to purchase alcohol around noon that day. When they asked Smith about the blood, he became "real nervous," "wip[ed] everything down," and threw "a bunch of stuff in bags" in their trash can.
According to Ledlow, they both then left with Smith and drove the Explorer to a nearby detail shop to have the interior cleaned. John Robinson, the owner of the detail shop, testified that, as he was cleaning Smith's Explorer, he noticed "a lot of red splatters in different spots" that "might have been blood." (R. 1149-50.)
While they waited for Smith's car to be detailed, Smith, Ledlow, and Foster went to Foster's mother's house in Stringfellow where Kevin's car had been hidden the *398 night before. After deciding to strip Kevin's car, they picked up Blake Hamilton and Teddy Smith and then returned to Foster's mother's house to work on the car. While Hamilton and Teddy removed parts, Foster and Ledlow searched the interior for anything of value. They found a credit card, a gold diamond cluster ring, and a Kodak brand camera. Ledlow later pawned the diamond cluster ring for $200, which she gave to Smith. At some point, Foster's mother walked inside the garage and told everyone to leave. She then contacted the police about the car.
After Smith, Ledlow, and Foster picked up Smith's Explorer, they parked the vehicle in the parking lot of a hospital in Anniston. They then attempted to find a trailer to dispose of Kevin's car. When they were unable to find one, they considered setting Kevin's vehicle on fire. In the end, they drove another vehicle to Carrollton, Georgia, checked into the Royal Inn motel, and drove to a nearby Wal-Mart where they threw several items, including Kevin's checkbook, into a trash can. The next morning, Foster, Ledlow, and Smith were detained at Hartsfield Jackson Airport in Atlanta, Georgia.
Foster told police where Smith had told them Kevin's body was located. Specifically, she told them that Kevin's body had been disposed of down an embankment near a set of guardrails on U.S. Highway 278. Based on that description, Investigator Seth Rochester of the Cherokee County Sheriff's Office was able to locate Kevin's body in the early morning hours of April 23, 2011. Dirt and leaves along the roadway appeared disturbed, as though "some type of struggle or fight had occurred" at the guardrail. (R. 831, 1842.) Police officers also noticed what appeared to be two knee prints in the dirt. They also found tire tracks, cigarette butts, and several cans near the guardrail.
After climbing down the steep embankment, police discovered Kevin's body facedown at the "edge of the tree line where he [was] caught up in some brush," with his body "smeared with mud and dirt." (R. 869, 1836.) Kevin's wrists were bound with duct tape and his injuries were substantial.
Emily Ward, a state medical examiner with the Alabama Department of Forensic Sciences, performed the autopsy on Kevin's body. Dr. Ward noted a cut across the front of the neck, which was deep enough to have compromised the windpipe and left jugular vein. This injury caused blood to aspirate into Kevin's lungs. He also suffered four haphazard stab wounds to the left side of his chest-two pierced the heart and all four pierced the left lung. Dr. Ward stated that the orientation of the wounds suggested that Kevin's assailants were standing while he was in a submissive position on the ground. He sustained a contusion to the entire left side of his face, consistent with punching or kicking. In Dr. Ward's opinion, this injury was caused by a "tremendous" amount of force. (R. 753.) Kevin bore superficial abrasions on his extremities, which could have been caused by falling; bruises to his wrists, which were consistent with his wrists being bound by duct tape; and defensive wounds to his palms. Dr. Ward stated that, although the stab wounds and injury to the throat were severally fatal, Kevin's death was not quick because he did not sustain arterial bleeding. In Dr. Ward's opinion, he would have been aware of his injuries and would have experienced significant pain.
Through their investigation, law-enforcement officers learned that Gaston had been with Tyrone the night Kevin went missing. Police officers were able to locate Gaston at his father's home, and Gaston agreed to accompany them to the police station for questioning. At that time, Taesha *399 Pulliam, Gaston's on-and-off girlfriend, gave them a camouflage-patterned .50 caliber black-powder rifle Gaston had previously placed in her car.
After being advised of his Miranda [2] rights, Gaston initially denied any knowledge of or involvement in Kevin's disappearance and death. Over the course of the interrogation, however, Gaston admitted that he was involved in the kidnapping and robbery of Kevin.
According to Gaston, after he and Tyrone dropped off Watkins and Bush, they drove to Tyrone's house in Nicholas Smith's Explorer and waited for Smith. When Smith arrived with Kevin, driving Kevin's car, the four men drove Kevin's car to an ATM. Gaston noted that Kevin rode in the back because Gaston was "too long" to sit comfortably in the backseat.
Gaston stated that Smith already had Kevin's debit card and that he "swiped it" at one of the ATMs in the area, and withdrew "two or three hundred" dollars. (Supp. III R. 94.)[3] Smith then gave Gaston $40. Gaston further stated that when they attempted to withdraw money from the second ATM, the transaction was denied. At that point, Gaston and Tyrone separated from Kevin and Smith. When Gaston and Tyrone reunited with Smith after midnight that night and unsuccessfully tried to withdraw money from a third ATM at the Fort McClellan Credit Union, Gaston said, Kevin was no longer with them.
When law-enforcement officers showed Gaston the security footage they obtained, Gaston identified himself in the front passenger seat with Smith in the driver seat. He also admitted that he had his camouflage-patterned rifle at that time but insisted that he was aiming the weapon at both Kevin and Tyrone and that he was "just the gun man." (Supp. III R. 95.) According to Gaston, at some point Tyrone asked him to shoot Kevin because he was concerned that Kevin could identify Tyrone as one of the individuals who robbed him. Gaston stated, however, that he refused to do so.
He then told law-enforcement officers that the men drove down "[s]ome black dark ass road" and parked near a guardrail. (Supp. III R. 75, 84, 87.) Gaston claimed he was unaware that Kevin was bound in the trunk until Smith and Tyrone removed him and placed him on the side of the road. Gaston told police he saw Smith and Tyrone "tussle" with Kevin, hitting him several times. According to Gaston, Smith stabbed Kevin and Kevin screamed. Smith then returned to the vehicle with a bloody, black-handled knife.[4]
Gaston drove Kevin's car to Foster's mother's house in Stringfellow while Tyrone and Smith followed in Smith's Explorer. After leaving Kevin's car at Foster's mother's house, Tyrone drove Gaston, who sat in the backseat of the Explorer, to Taesha Pulliam's house.
On May 13, 2011, Gaston was indicted on one count of murder made capital because it was committed during a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and one count of murder made capital because it was committed during a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. After attorneys David L. Johnston, Jr., and Tom *400 Harmon were appointed to represent him, Gaston entered a plea of not guilty and a plea of not guilty by reason of mental disease or defect on both counts.
Gaston's trial commenced on September 28, 2015, and seven days later the jury found him guilty of both charges. During the penalty phase, the jury found by special verdict forms that the State had established two aggravating factors beyond a reasonable doubt: (1) that Gaston committed the capital offenses while under a sentence of imprisonment[5] and (2) that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses.[6] On October 7, 2015, the jury recommended by a vote of 10 to 2 that Gaston be sentenced to death.
On November 12, 2015, the circuit court accepted the jury's recommendation and sentenced Gaston to death. In doing so, the circuit court found that the mitigating circumstances[7] in Gaston's case were substantially outweighed by the aggravating circumstances. Thereafter, Gaston filed a timely notice of appeal.
Standard of Review
On appeal from his convictions and sentence, Gaston raises numerous issues, including some that were not raised in the trial court. Because Gaston has been sentenced to death, however, this Court must review the circuit court proceedings under the plain-error doctrine. See Rule 45A, Ala. R. App. P.
" ' "Plain error is defined as error that has 'adversely affected the substantial right of the appellant.' The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed. 2d 1 (1985), the plain-error doctrine applies only if the error is 'particularly egregious' and if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed. 2d 1012 (1999)." '
" Ex parte Brown, 11 So.3d 933, 935-36 (Ala. 2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim. App. 1999) ). See also Ex parte Walker, 972 So.2d 737, 742 (Ala. 2007) ; Ex parte Trawick, 698 So.2d 162, 167 (Ala. 1997) ; Harris v. State, 2 So.3d 880, 896 (Ala. Crim. App. 2007) ; and Hyde v. State, 778 So.2d 199, 209 (Ala. Crim. App. 1998) ('To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.'). Although the failure to object in the trial court will not preclude this Court from reviewing an issue under Rule 45A, Ala. R. App. P., it will weigh against any claim of prejudice made on *401 appeal. See Dotch v. State, 67 So.3d 936, 965 (Ala. Crim. App. 2010) (citing Dill v. State, 600 So.2d 343 (Ala. Crim. App. 1991) ). Additionally, application of the plain-error rule
" ' " 'is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' " Whitehead v. State, [777 So.2d 781], at 794 [ (Ala. Crim. App. 1999) ], quoting Burton v. State, 651 So.2d 641, 645 (Ala. Crim. App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed. 2d 862 (1995).'
" Centobie v. State, 861 So.2d 1111, 1118 (Ala. Crim. App. 2001)."
Phillips v. State, [Ms. CR-12-0197, December 18, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015). With these principles in mind, we address Gaston's claims on appeal.
Discussion
I.[8]
Gaston argues that the circuit court violated his constitutional rights under the Sixth Amendment to the United States Constitution in at least two distinct ways. (Gaston's brief, pp. 57-64.) First, Gaston contends that the circuit court violated his Sixth Amendment right to counsel by denying his repeated requests to dismiss his counsel and to have new counsel appointed. (Gaston's brief, pp. 61-64.) Second, he argues that the circuit court violated his Sixth Amendment right to self-representation by denying what he says were his "clear and unequivocal" requests to represent himself at his capital-murder trial. (Gaston's brief, pp. 57-61.) Because of the nature of Gaston's arguments, a brief recitation of the facts underlying his claims is necessary.
The record indicates that attorneys David L. Johnston, Jr., and Thomas W. Harmon were appointed to represent Gaston during his capital-murder trial. On April 12, 2012, Gaston filed a pro se letter with the circuit court asking the court to dismiss his appointed counsel for "lack of attention [in] representing" him. (C. 59, R. 15-16.) A hearing was held on May 4, 2012, during which the circuit judge asked Gaston if he wanted to dismiss his appointed counsel. (R. 16.) Gaston stated that he did not. (R. 16.) During that same hearing, the circuit court noted that Gaston was represented by counsel and advised Gaston that any additional filings he made going forward should be made through his appointed counsel. (R. 25.)
Despite this warning, Gaston continued to file pro se motions and letters addressed to the clerk, the trial judge, and the district attorney, in which he continued to express his general dissatisfaction with his counsel. In November 2012, Gaston submitted another pro se letter to the circuit court in which he stated that his lawyer had repeatedly lied to him and asked the court to grant his request for bond so that he could hire a new lawyer. (C. 88-89.) That request was denied on January 9, 2013. (C. 92.)
On February 12, 2013, Gaston filed a pro se letter with the circuit court in which he asked the court to dismiss his defense counsel. (C. 95.) In his letter, Gaston stated that he believed his counsel was not "representing [him] properly" and that he believed they were hiding something from him. On March 13, 2013, the circuit court denied that request. (C. 99.)
On April 3, 2014, Gaston filed another pro se letter in which he, once again, stated that he wanted to fire his defense attorney because, he said, his counsel had a *402 poor work ethic and had been lying to Gaston and his family. (C. 111.) He also indicated that he could represent himself. Although not entirely clear from the record, it appears that Gaston submitted an attachment with that letter in which he specifically asked the court to appoint him new counsel and indicated that, if it failed to do so, he would like to represent himself. (C. 113.) On April 30, 2014, the circuit court issued an order denying Gaston's request. (C. 120.)
Around that time, Gaston filed a pro se motion for a speedy trial, a pro se letter asking the circuit court to allow him to conduct discovery, and a pro se letter asking District Attorney Brian McVeigh to provide him with the evidence in the district attorney's file for Gaston's review. (C. 121, 122, 123-24.) In a letter attached to his pro se motion for a speedy trial, Gaston stated that he had "been informed that [his] attorneys do not seek to represent [him] anymore so [he would] file [his] own said motions." (C. 122.) That motion was denied by the circuit court as an improper pro se motion on August 15, 2014. (C. 135.)
On August 12, 2014, he also filed a pro se motion to dismiss the charges against him. (C. 129-33.) In his pro se motion, Gaston wrote:
"1) I am locked up because my lawyers have no intentions of proving my innocence cause they are all in with the district attorney. My attorney wins and the district attorney win both get paid on my behalf. I cannot stop that don't care. I just want some justice. Everybody has said I'm innocent why are they still against me? Why the judge [won't] allow me to dismiss and get rid of my attorney for someone who gone do right? It's not right all."
(C. 129-32.) That motion was denied by the circuit court as an improper pro se motion on August 15, 2014. (C. 134.)
Finally, in late 2014, Gaston filed another pro se letter with the court in which he expressed his disappointment with the way his defense counsel were representing him and explained that he did not want Johnston or Harmon to continue to represent him. (C. 136.) Gaston wrote:
"You keep telling me that I have counsel when I'm trying to tell you I don't[;] they have told my mother that they no longer want to represent me and I will have to go in front of the judge to be appointed new counsel. ... If I had proper counsel I would not have to keep presenting motions to you[;] my counsel would do their job. Even if David L. Johnston Jr. and Thomas W. Harmon do wish to represent me I no longer want them too, cause they tell my family they off my case, but you think they are, I don't need them on my case half doing stuff[.] I need straight up people or I wish to represent myself. Cause right now I know they are angry with me, they ain't coming to see me, they ain't fi[l]ing my motions you can see that so they ain't representing me, so 41 months later they don't know nothing or can tell me nothing [won't] help me or come to see me, so really I do not trust my life in their hands at a trial with them [lying] saying they are [not] representing me to my momma but to the courts they representing me, so 41 month later they don't know nothing or can tell me nothing, want to help me and come to see me, so really I do not trust my life in their hands at a trial with them [lying] saying they are not representing me to my momma but to the courts they representing me. I can only [feel] they using me for a check, but I respect their game. I just want to be handled properly with and by my counsel so if it's not through them two can you [acquire] me two more *403 attorneys please so I can get in court. Thank you."
Id. (emphasis added). Nothing in the record indicates whether the circuit court took any action on this last pro se letter.
A.
First, Gaston contends that the circuit court violated his Sixth Amendment right to counsel by denying his repeated requests to dismiss his counsel and to have new counsel appointed. (Gaston's brief, pp. 61-64.)[9] This Court has previously stated:
" 'While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala. Cr. App. 1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed. 2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed. 2d 610 (1983) ; Siers v. Ryan, 773 F.2d 37 (3d Cir. 1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed. 2d 194 (1989).
" 'The decision to substitute or to remove court-appointed counsel and to appoint new counsel for an accused rests within the sound discretion of the trial court. Boldin v. State, 585 So.2d 218 (Ala. Cr. App. 1991) ; Cox v. State, 489 So.2d 612 (Ala. Cr. App. 1985). In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense. Boldin v. State; Cox v. State.'
" Snell v. State, 723 So.2d 105, 107 (Ala. Crim. App. 1998).
"Alabama has little law on the circumstances that warrant a hearing on a defendant's request to substitute counsel, so we have looked to other courts for guidance. The Florida Supreme Court, in what appears to be the prevailing view, stated:
" 'This Court has consistently found a ... hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made. See Davis v. State, 703 So.2d 1055, 1058-59 (Fla. 1997) ; Gudinas [v. State], 693 So.2d [953] at 962 n.12 [ (Fla. 1997) ] ; Branch v. State, 685 So.2d 1250, 1252 (Fla. 1996). Similarly, a trial court does not err in failing to conduct a[n]
*404 ... inquiry where the defendant merely expresses dissatisfaction with his attorney. See Davis, 703 So.2d at 1058-59 ; Branch, 685 So.2d at 1252 ; Dunn v. State, 730 So.2d 309, 311-12 (Fla. 4th DCA 1999).'
" State v. Wabashaw, 274 Neb. 394, 403, 740 N.W.2d 583, 593 (2007). The Connecticut Supreme Court has stated:
" 'The defendant contends that even if the trial court was not required to appoint new counsel, it was at the very least required to inquire into the defendant's request. We are unpersuaded. "Where a defendant voices a 'seemingly substantial complaint about counsel,' the court should inquire into the reasons for dissatisfaction." McKee v. Harris, [649 F.2d 927], 933 [ (2d Cir. 1981) ], quoting United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed. 2d 587, reh. denied, 411 U.S. 941, 93 S.Ct. 1891, 36 L.Ed. 2d 404 (1973).'
" State v. Gonzalez, 205 Conn. 673, 685, 535 A.2d 345, 352 (1987). The Texas Court of Criminal Appeals has stated:
" '[A]ppellant maintains that the failure of the court to hold a hearing on his motion to dismiss counsel denied his procedural and substantive due process rights. We disagree. We have found no case law mandating the trial court to sua sponte hold a hearing on this matter.'
" Malcom v. State, 628 S.W.2d 790, 792 (Tex. Crim. App. 1982). See United States v. Smith, 282 F.3d 758, 764 (9th Cir. 2002) ('[T]he failure to conduct a hearing [on the motion to substitute counsel] is not itself an abuse of discretion.'); United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972) ('If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right.'). See also Carl T. Drechsler, Withdrawal, Discharge, or Substitution of Counsel in Criminal Case as Ground for Continuance, 73 A.L.R.3d 725 (1976)."
Boyle v. State, 154 So.3d 171, 190-92 (Ala. Crim. App. 2013) (emphasis added).
As outlined above, Gaston filed several pro se letters with the circuit court asking the court to dismiss Johnston and Harmon and to appoint new counsel. Although we acknowledge that in each of those pro se letters Gaston made it clear that he believed Johnston and Harmon were providing inadequate representation, were being untruthful with him, were trying to avoid answering questions he had about his case, and were colluding with the district attorney's office, nothing in the record supports those accusations. Importantly, Gaston has failed to show the existence of "a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense," which this Court has held to be key in prevailing on a motion for substitution of counsel. See Boyle, 154 So.3d at 191. Additionally, in looking to other courts for guidance, we agree that mere distrust or dissatisfaction with appointed counsel is not enough to require the trial court to conduct a hearing on a motion to dismiss appointed counsel. See id. Thus, Gaston is not entitled to relief on this claim.
B.
Second, Gaston contends that the circuit court violated his Sixth Amendment right to self-representation by denying *405 his repeated requests to represent himself before his capital-murder trial began. (Gaston's brief, pp. 57-61.) According to Gaston, he repeatedly informed the circuit court through a series of pro se letters that he was dissatisfied with his appointed defense counsel and that he wanted to represent himself. Id. Relying on the United States Supreme Court's decision in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), Gaston contends that he made his request clear and that the circuit court should have held a hearing to determine whether Gaston " 'knowingly, intelligently, and voluntarily waived his right to counsel.' " (Gaston's brief, p. 60 (quoting Kennedy v. State, 186 So.3d 507, 521 (Ala. Crim. App. 2015) ).) According to Gaston, had the circuit court held such a hearing, it would have been clear that he was knowingly, intelligently, and voluntarily waiving his right to counsel, and the court would have been required to honor his request to let him represent himself. Id. This argument was not raised at the trial level and will thus be reviewed for plain error. See Rule 45A, Ala. R. App. P.
In his brief on appeal, Gaston contends that three of his pro se letters to the circuit court support his argument. (Gaston's brief, p. 61 (citing C. 111, 113, 136).) The first letter he references in his brief on appeal is the pro se letter he filed with the circuit court on April 3, 2014, in which he stated that his defense counsel, David L. Johnston, Jr., and Thomas W. Harmon, were not providing adequate representation and that he was frustrated with the number of times his case had been continued. (C. 111-12.) Although he stated that he could represent himself, he did not explicitly state that he wanted to represent himself at that time. Id.
Attached to that letter was another letter addressed to the circuit judge in which Gaston, once again, complained about the representation he had been receiving from his appointed defense counsel. (C. 113.) He asked the court to appoint new counsel and stated that, if new counsel could not be appointed, then he wanted to represent himself. (C. 113.) Finally, the last letter Gaston references in his brief is a pro se letter he appeared to have filed in late 2014 in which he expressed his disappointment with the way in which his defense counsel were representing him. (C. 136.) Although the purpose of the letter appears to be a request to have new counsel appointed, Gaston does state: "I need straight up people [working on my case] or I wish to represent myself cause right now I know [my defense counsel are] angry with me." Id.
This Court has previously stated:
" 'In Faretta v. California, 422 U.S. 806 (1975), the Supreme Court held that a defendant has a Sixth Amendment right to represent himself in a criminal case.' Tomlin v. State, 601 So.2d 124, 128 (Ala. 1991). The right to self representation does not attach until it is asserted 'clearly and unequivocally.' See Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975)."
Simons v. State, 217 So.3d 16, 21 (Ala. Crim. App. 2016). Additionally,
"[a]n accused 'may waive his ... right to counsel ... after the court has ascertained that the defendant knowingly, intelligently, and voluntarily desires to forgo that right.' Rule 6.1(b), Ala. R. Crim. P. This right is constitutionally guaranteed by the Sixth Amendment to the United States Constitution and by Art. I, § 6, of the Alabama Constitution of 1901. See also Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975) ; Tomlin v. State, 601 So.2d 124, 128 (Ala. 1991) ;
*406 Parker v. State, 455 So.2d 111, 112-13 (Ala. Crim. App. 1984) ; Luckie v. State, 55 Ala. App. 642, 644, 318 So.2d 337, 339, cert. denied, 294 Ala. 764, 318 So.2d 341 (1975)."
White v. State, 900 So.2d 1249, 1254 (Ala. Crim. App. 2004).
Based on the letters discussed above, Gaston's expression of his dissatisfaction with his defense attorneys and his desire to have new counsel appointed-and not to represent himself-appear to have been the primary purpose of his communication with the court. In fact, in two of the letters discussed above, Gaston indicates that he would seek to represent himself going forward only in the event the court failed to appoint new counsel. The record indicates that Johnston and Harmon were never replaced and that they represented Gaston during all the proceedings in his capital-murder case. Importantly, there is nothing in the record indicating that Gaston reasserted his request to serve as his own counsel after it became clear that new counsel would not be appointed. As noted above, a request to represent one's self must be made "clearly and unequivocally." Faretta, 422 U.S. at 835. Gaston has not met this standard and, thus, this claim does not rise to the level of plain error.
II.[10]
Next, Gaston argues that the State delayed his trial for four years without good reason violating his right to a speedy trial under the Sixth Amendment to the United States Constitution. (Gaston's brief, pp. 64-70.) Although he filed his two speedy-trial motions pro se, Gaston contends that this should not be held against him. (Gaston's brief, pp. 69-70.) Additionally, Gaston argues that, despite his repeated requests for a speedy trial, the "inexcusable four-year wait" between his indictment in May 2011 and his trial in September 2015 was unjustified and presumptively prejudicial. (Gaston's brief, p. 64.) Applying the four-factor speedy-trial inquiry from the United States Supreme Court case Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), Gaston contends that his right to a speedy trial was violated and, thus, that his conviction is due to be reversed. (Gaston's brief, pp. 64-69.)
A.
First, although not a model of clarity, Gaston appears to argue that the fact that he filed his speedy-trial motions pro se should not be held against him. (Gaston's brief, pp. 69-70.) The record shows that the circuit court denied Gaston's second motion for a speedy trial for the following reason: "Defendant is represented by counsel and this Court will not entertain pro se motions of a defendant who is represented by counsel. Any motions of Defendant should be filed by his attorney." (C. 135.) According to Gaston, the circuit court abused its discretion by denying his second pro se motion on that basis because, he says, his lawyers were not adequately representing him and, thus, as far as he was concerned, he was not represented by counsel. (Gaston's brief, p. 70.) This claim is without merit.
This Court has previously stated:
"Although Rule 31(a), Ala. R. App. P., prohibits a party represented by counsel from filing a pro se brief, there is no specific rule addressing such a matter in the trial courts. However, disregarding a defendant's pro se pleading or motion is not generally subject to criticism when the defendant is represented by counsel. See Pardue v. State, 571 So.2d 320, 329-30 (Ala. Crim. App. 1989), reversed on other grounds, 571 So.2d 333 (Ala. 1990).
*407 Although no Alabama appellate court decisions specifically address the particular issue raised in this case, courts in other jurisdictions have held that a defendant is not entitled to file pro se pleadings or motions when represented by counsel. See Hutchinson v. Florida, 677 F.3d 1097, 1107 (11th Cir. 2012) ; Martin v. State, 797 P.2d 1209, 1217 (Alaska Ct. App.1990) ('The trial court therefore has the authority to require a defendant who is represented by counsel to act through counsel.'). See also cases cited in Salser v. State, 582 So.2d 12, 14 (Fla. Dist. Ct. App. 1991). The only exception to this rule applies to pro se motions requesting discharge of counsel. See Finfrock v. State, 84 So.3d 431, 433-34 (Fla. Dist. Ct. App. 2012)."
Trimble v. State, 157 So.3d 1001, 1006-07 (Ala. Crim. App. 2014).
In this case, Gaston was represented by appointed counsel when he filed both of his pro se speedy-trial motions. Because he was represented by counsel, he had no right to have his pro se motions considered by the court. Therefore, the circuit court was within its discretion to deny Gaston's second pro se motion.[11]
B.
Gaston contends that all four factors in the speedy-trial inquiry found in the United States Supreme Court's decision, Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972), weigh in his favor. In Barker, the Court set out the following four factors to be weighed when determining whether an accused has been denied his constitutional right to a speedy trial: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his or her right to a speedy trial; and (4) the degree of prejudice suffered by the accused due to the delay. In Ex parte Walker, 928 So.2d 259, 263 (Ala. 2005), the Alabama Supreme Court stated:
" 'A single factor is not necessarily determinative, because this is a "balancing test, in which the conduct of both the prosecution and the defense are weighed." ' Ex parte Clopton, 656 So.2d [1243] at 1245 [ (Ala. 1985) ] (quoting Barker [v. Wingo ], 407 U.S. [514] at 530 [ (1982) ] ). We examine each factor in turn."
With these principles in mind, we analyze Gaston's speedy-trial claim.
1. Length of Delay
Gaston argues, and the State agrees, that the four-year delay between his indictment in May 2011 and his trial beginning in September 2015, was presumptively prejudicial. In Alabama, " '[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant-whichever is earlier-to the date of the trial.' " Boyle v. State, 154 So.3d 171, 192 (Ala. Crim. App. 2013) (quoting Ex parte Walker, 928 So.2d at 264 ). Additionally,
" '[a] finding that the length of delay is presumptively prejudicial "triggers" an examination of the remaining three Barker factors. [ Doggett v. United States,] 505 U.S. [647] at 652 n.1, 112 S.Ct. 2686, 120 L.Ed. 2d 520 [ (1992) ] ("[A]s the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the *408 point at which courts deem the delay unreasonable enough to trigger the Barker enquiry.").' "
154 So.3d at 192-93 (quoting Walker, 928 So. 2d at 263-64 ). This Court has previously found that a delay of 48 months, or 4 years, between the time of a defendant's arrest or indictment and his trial is presumptively prejudicial and will trigger an examination of the remaining Barker factors. See Boyle, 154 So.3d at 193. We have also found delays shorter than that to be presumptively prejudicial. See State v. Van Wooten, 952 So.2d 1176 (Ala. Crim. App. 2006) (declaring 29-month delay presumptively prejudicial); Ex parte Anderson, 979 So.2d 777 (Ala. 2007) (noting that delays of less than 26 months have been found to be presumptively prejudicial).
Here, Gaston was indicted and arrested in May 2011, and was later tried in the beginning of September 2015. There was more than a 50-month delay between Gaston's indictment and his trial. Under the principles of law discussed above, we agree with Gaston and the State that the length of this delay was presumptively prejudicial. We must now examine the remaining three Barker factors.
2. Reasons for the Delay
Gaston contends that the State chose to delay his trial. (Gaston's brief, pp. 66.) Specifically, Gaston argues that, the State's delayed decision in choosing to try him after it had tried Nicholas Smith was not a sufficient justification for delaying his trial for four years. Id.
Because of the nature of Gaston's claims here, a brief recitation of the procedural history underlying those claims is necessary. On July 6, 2011-approximately 71 days after he was arrested-Gaston filed a pro se letter to the circuit court in which he asserted his right to a speedy trial. (C. 3, 41.) It is unclear from the record whether the circuit court ruled on this motion.
On May 14, 2012, a status conference was held during which the State and Gaston's defense team informed the court about the progress of discovery and also discussed when they would be prepared to try Gaston's capital-murder case. (R. 13-26.) During that status conference, the prosecutor explained that the State had been complying with the circuit court's discovery order and that it was still waiting on an additional forensic DNA report and any information or material the defense might have had concerning Gaston's educational background and mental-health issues. (R. 17.) Upon request by both the State and the defense, the circuit court issued an order that day granting the State's motion for Gaston to undergo a mental evaluation and continuing all criminal proceedings against Gaston until that evaluation had been completed. (C. 66-68.)[12]
During that same conference, the prosecutor expressed concern over when Gaston could be tried because he was one of three codefendants that the State intended to try for Kevin Thompson's murder. (R. 20.) Specifically, the prosecutor explained:
"Your Honor, Judge Howell has Nicholas Noelani Smith and Judge Jones has Tyrone Thompson. And my concern is there have been discussions, and I think Mr. Johnston may have been party to them, with comments as to who would be first and who would be second and third. And at this point it's really not *409 known how we will proceed, depending upon how trial weeks bear out next year, when those DNA reports come in, but Judge Jones has let me know that the point at which those DNA reports finally come in that she would be pushing the defense to try her case and move it quickly in an effort to try to address all the codefendants in a timely manner. But she has put them on notice that once that comes through they need to be ready within-I think she told them within six months to a year to be looking at that case. And that's-Mr. Lawton and Ms. Vernon represents that particular defendant. And Mr. Quinlan and Mr. Clay represent Mr. Smith. And yours was the third status conference set, so we've had status conferences on the other two codefendants and I have announced the same to the judges in those cases."
(R. 21-22.) When asked by the court if there was any reason why Gaston's case could not be tried within 6 to 12 months of receiving that evidence, the prosecutor stated there was none and Gaston's defense counsel agreed, stating that that time frame was "more than reasonable for the defense." (R. 22-23.) The State even emphasized its desire to have all three codefendants ready to try as soon as possible so that the State could "try these cases quickly." (R. 20.)
Over two years later, on August 12, 2014, Gaston filed his second pro se speedy-trial motion with the circuit court. (C. 121.) That motion was denied on August 15, 2014. (C. 135.)
Eight months later, on April 15, 2015, the circuit court held another status conference on the State's motion for a status conference during which the State explained why Gaston's case still had not been tried. The State explained:
"If the Court will allow-and Mr. Johnston and Mr. Harmon should advise me if I say anything inaccurate-we're coming up on the end of this summer two years since we tried and convicted Nicholas Smith, one of the three people that were charged in this case. Our second case that we scheduled and planned on trying was against Tyrone Thompson. Mr. Smith was with Judge Howell. Mr. Thompson is with Judge Jones. And our plan was to try this defendant third. We just have not been able to get a court date on Tyrone Thompson due to plenty of factors involving his request of an Atkins [v. Virginia, 536 U.S. 304 (2002) ] evaluation and other problems. There have been numerous ex parte hearings. So to be honest with the Court I don't know what all the factors are and why that has been delayed.
"The other day I got a letter from Mr. Gaston. It was not a speedy trial request, but it had some of the same verbiage that one might have in it. So that letter, my frustration at being unable to get a court date for a second trial, and some discussions that I've had with Ms. Curry regarding her frustration at wanting to have her day in Court, which every victim has a right to do, led me to contact defense counsel and ask [District Attorney Lynn] Hammond to file this motion with the Court.
"So basically I'm asking the Court for two things today: Can I have a trial date? And would this Court put us on pace to make sure that we're in compliance with all discovery and mitigation requests so that we could be ready for that trial date?
"We talked briefly, Ms. Hammond and I, that our target date would be the September 28th trial week. But obviously since I'm the one asking I would submit to any date the Court would give *410 me, but I'm just tired of waiting. And that's through no fault of these lawyers. They have been under the understanding their guy would be third, and those circumstances have changed for me."
(R. 44-46.)[13] When the court asked Gaston's defense counsel for a response, the following exchange occurred:
"[DEFENSE COUNSEL:] On behalf of Mr. Gaston and Mr. Harmon, the September date is certainly within reach as far as the guilt phase would be-and I've explained to Ms. Hammond in conversations when this came up about I believe seven to 10 days ago about moving us ahead of Mr. Thompson as far as the trial calendar would go. But I will have to check with Joann Terrell and Stan Brodski, the folks who agreed to do the mitigation work. There's been preliminary discussions that they may be available at that late September date. I'm going to confirm with them that they would be and that any work that needed to be done in this case could be done by then. I'm confident that Tom and I can be ready on the guilt part of it by then.
"There have been some issues with Mr. Gaston as far as Bar complaints. We are going to endeavor to work through those, and we will report to the Court immediately if that becomes an issue again. And if there are issues with communication stemming from those complaints-is that our agreement, Tom?
"[PROSECUTOR:] Yes."
"....
"[DEFENSE COUNSEL:] I mean, if this was simply a non-death case, we're ready. We can be ready in September, that is not a problem. That's what we can tell the Court today.
"[PROSECUTOR:] And, Judge, I think I would be willing to say to move this logjam-it's not any fault of this Court, but to get some movement in these cases I would be willing to shift around other trials to facilitate that."
(R. 47-48, 50.) Following this discussion, the circuit court set Gaston's trial date for September 28, 2015. (R. 58.)
This Court has previously stated:
" 'Courts assign different weight to different reasons for delay. Deliberate delay is "weighted heavily" against the State. [ Barker v. Wingo,] 407 U.S. [514,] 531 [ (1982) ]. Deliberate delay includes an "attempt to delay the trial in order to hamper the defense" or " 'to gain some tactical advantage over (defendants) or to harass them.' " 407 U.S. at 531 & n.32 (quoting United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed. 2d 468 (1971) ). Negligent delay is weighted less heavily against the State than is deliberate delay. Barker, 407 U.S. at 531 ; Ex parte Carrell, 565 So.2d [104,] 108 [ (Ala. 1990) ]. Justified delay-which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible-is not weighted against the State. Barker, 407 U.S. at 531 ; Zumbado v. State, 615 So.2d 1223, 1234 (Ala. Crim. App. 1993) (" 'Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.' ") (quoting McCallum v. State, 407 So.2d 865, 868 (Ala. Crim. App. 1981) ).' "
*411 Boyle, 154 So.3d 171 at 193 (quoting Ex parte Walker, 928 So. 2d at 265 ).
Based on the events outlined above, nothing in the record suggests that the State deliberately or negligently delayed Gaston's trial. In fact, at one of the first status conferences in May 2012, the State clearly indicated that it wanted to try Gaston's case quickly and that it intended to be ready for trial 6 to 12 months after receiving the last discovery it needed, including forensic reports and a report on Gaston's mental health. Gaston was evaluated in June 2012 (Supp. I C. 10),[14] forensic reports from both the Alabama Department of Forensic Sciences and the FBI were disclosed in January 2013 (C. 93-94), and discovery was ongoing until May 2015. (C. 150.) Finally, Gaston's forensic or psychological assessment and background check were not completed until after June 2015. (C. 151-52.)
It appears that the primary reason for the delay in trying Gaston's case stemmed from issues that the State was experiencing with the criminal proceedings against Tyrone Thompson. Evidently frustrated with the progress of that case and determined to have Gaston tried in a timely manner, both the State and the defense agreed that Gaston's trial needed to be moved ahead of Tyrone's trial and ultimately agreed to try Gaston's case in September 2015. Those circumstances appeared to have been beyond the State's control. Thus, this factor does not weigh in Gaston's favor.
3. Assertion of Right
Gaston argues, and the State agrees, that Gaston's repeated requests for a fast and speedy trial weigh in his favor. (Gaston's brief, pp. 66-67, and State's brief, p. 61.) The Alabama Supreme Court has previously stated:
"[C]ourts applying the Barker factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, and not every assertion of the right to a speedy trial is weighted equally. Compare Kelley v. State, 568 So.2d 405, 410 (Ala. Crim. App. 1990) ('Repeated requests for a speedy trial weigh heavily in favor of an accused.'), with Clancy v. State, 886 So.2d 166, 172 (Ala. Crim. App. 2003) (weighing third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: ' "The fact that the appellant did not assert his right to a speedy trial sooner 'tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.' " ') (quoting Benefield v. State, 726 So.2d 286, 291 (Ala. Crim. App. 1997), additional citations omitted), and Brown v. State, 392 So.2d 1248, 1254 (Ala. Crim. App. 1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial)."
Ex parte Walker, 928 So.2d at 265-66.
In the present case, the record shows that, on July 6, 2011-approximately 71 days after he was arrested-Gaston filed a pro se letter to the circuit court in which he asserted his right to a speedy trial. (C. 3, 41.) It is unclear from the record whether the circuit court granted or denied that motion. The next time Gaston asserted his right to a speedy trial was in a pro se speedy-trial motion filed on August 12, 2014-a little more than one year before his trial. (C. 121.) That motion was denied on August 15, 2014. (C. 135.) Because Gaston moved for a speedy trial twice-once *412 71 days after his arrest and again more than one year before his trial-this factor weighs in favor of Gaston.
4. Prejudice to Defendant
Gaston contends that the substantial and repeated delays in his trial proceedings prejudiced him. (Gaston's brief, pp. 67-69.) Citing the types of harm that can result from the delay of a defendant's trial found in Barker, supra, Gaston specifically contends that this final factor weighs in his favor because, he says, this delay caused him significant anxiety and distress and resulted in witnesses' memories fading. Id.
In Ex parte Walker, 928 So.2d 259, 267-68 (Ala. 2005), the Alabama Supreme Court wrote:
"The United States Supreme Court has recognized three types of harm that may result from depriving a defendant of the right to a speedy trial: ' "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence.' Doggett [v. United States ], 505 U.S. [647,] 654, 112 S.Ct. 2686, 120 L.Ed.2d 520 [ (1992) ] (quoting Barker [v. Wingo ], 407 U.S. [514,] 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 [ (1972) ], and citing Smith v. Hooey, 393 U.S. 374, 377-79, 89 S.Ct. 575, 21 L.Ed. 2d 607 (1969) ; United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed. 2d 627 (1966) ). 'Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." ' 505 U.S. at 654, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 532, 92 S.Ct. 2182 )."
Gaston contends that all three of the harms listed by the Barker Court are present here. We disagree.
First, Gaston contends that he suffered from "oppressive pretrial incarceration" because while he was incarcerated, he says, he was "greatly distressed that he could not care for his family, including his young son, who were suffering emotionally, medically, and financially." (Gaston's brief, pp. 67-68.) There is nothing in the record to support this contention.
Second, Gaston contends that his letters to the circuit judge and district attorney demonstrate that he was suffering from anxiety because he stated in those letters that he was "tired of this" and was "losing his mind." (Gaston's brief, p. 68 (quoting C. 175).) Although we acknowledge that Gaston's letters do contain references to the anxiety he claims he was suffering, nothing else in the record supports this contention. See Scheuing v. State, 161 So.3d 245, 291 (Ala. Crim. App. 2013) (finding no prejudice because that there was no evidence to support appellant's assertion that he suffered from anxiety and emotional stress).
Third, Gaston generally argues that the four-year delay resulted in the failure of law-enforcement officers to remember their investigation and failure of other witnesses to remember evidence concerning the guilt and relative culpability of Nicholas Smith and Tyrone Thompson in Kevin's murder. Gaston contends this ultimately impaired his defense at trial. (Gaston's brief, pp. 68-69.) Gaston, however, has not demonstrated how the delay actually impaired his defense. Because Gaston has failed to establish that he suffered actual prejudice as a result of the delay, this factor does not weigh in his favor.
Applying the factors set out by the United States Supreme Court in Barker, supra, we cannot say that Gaston was denied his constitutional right to a speedy trial. Accordingly, he is not entitled to relief on this claim.
*413 III.[15]
Gaston argues that the circuit court erred by excluding for cause five potential jurors who, he says, correctly objected to imposing accessorial liability for capital murder without proof of intent to kill. (Gaston's brief, pp. 70-74.) According to Gaston, allowing the State to strike those jurors on that basis was erroneous because, he argues, in posing its questions to the veniremembers, the State misstated Alabama law on accomplice liability by failing to explain that, in order to be convicted of capital murder, the accomplice must share the principal's intent to kill. (Gaston's brief, p. 72.) As a result, Gaston says that his convictions and death sentence are due to be overturned. (Gaston's brief, pp. 73-74.) Gaston did not object to the State's strikes of the five jury veniremembers; thus, we will review this claim for plain error. See Rule 45A, Ala. R. App. P.
Because of the nature of Gaston's claim, a brief recitation of the facts underlying the claim is necessary here. During voir dire, veniremembers were divided into three panels: A, B, and C. (R. 308, 420, and 531.) The State presented each panel with the following hypothetical to determine whether veniremembers could hold an accused accountable for a victim's death under an accomplice-liability theory:
"[PROSECUTOR:] The closest example that I can give without getting into the facts of this case is a bank robbery. Okay? If I have a gunman that goes into a bank and holds a teller at bay and gets money from the teller, okay, and I have a getaway drive and I have a lookout, all those people under Alabama law are treated the same. Does everybody understand that?
"....
"[PROSECUTOR:] All right. If the gunman shoots and kills the clerk, the getaway driver and the lookout are treated the same. Anybody have a problem with that?"
(R. 345, see also R. 448-49, and 559-60.) Gaston notes that a total of nine veniremembers indicated that they would object to imposing liability on the getaway driver and lookout for the robber's killing of the clerk under an accomplice liability theory.[16] On appeal, however, he argues that the circuit court erred in granting the State's motion to remove five of those veniremembers for cause based on their responses to the State's hypothetical.
Those veniremembers were C.A., T.B., S.C., T.D., and J.D., all of whom were from Panel A. (R. 345-46.) After identifying those jurors, the State then clarified:
"For those of you that answered you would not be able to hold the codefendants, the getaway driver and the lookout, to the same standard as the shooter in that case, am I saying that correctly?
"(Heads nodding.)"
(R. 346.) The State did not ask any additional follow-up questions at that time. Id.
This Court has previously stated:
" 'To successfully remove a juror for cause the challenge must be based on the statutory grounds set out in § 12-16-150, Ala. Code 1975, or related to a matter that imports absolute bias on the part of the juror. See Tomlin v. State, 909 So.2d 213, 235-36 (Ala. Crim. App. 2002), rev'd on other grounds, 909 So.2d 283 (Ala. 2003).' "
*414 Russell v. State, [Ms. CR-13-0513, Sept. 8, 2017] --- So.3d ----, ---- (Ala. Crim. App. 2017) (quoting Sneed v. State, 1 So.3d 104, 137 (Ala. Crim. App. 2007) ). Importantly, this Court has also previously recognized that the trial judge is given much discretion in determining whether a potential juror should be struck for cause. See Sneed, 1 So.3d at 136. A review of the record on appeal demonstrates that none of the five veniremembers were removed for cause under any of the statutory exclusions of § 12-16-150, Ala. Code 1975. Thus, the State's challenge to each of the five jurors listed above must have been related to a "matter that imports absolute bias on the part" of each of them. Russell, --- So.3d at ----.
In the present case, when given the opportunity to strike jurors for cause, the State moved to strike those five veniremembers for the following reasons. First, the State moved to strike T.D. based on his response to the accomplice-liability hypothetical, and the trial judge noted that the juror had already been removed because he "had indicated that he was in the middle of a panic attack and that for ... medical reasons that [T.D.] would be dismissed." (R. 641.) Defense counsel stated he had no objection and also noted that T.D. had also "said he couldn't give the case the necessary attention." (R. 641.) It is well settled that the circuit judge has broad discretion in excusing veniremembers based on sickness or personal reasons. See Brown v. State, 11 So.3d 866, 891 (Ala. Crim. App. 2007) (holding that the circuit court did not abuse its broad discretion in removing a juror because of her medical condition). Additionally, removal of a juror on the basis that he stated that he would not be able to give the trial his full attention has also been deemed proper. See Carroll v. State, 701 So.2d 47, 52 (Ala. Crim. App. 1996) (holding that striking of potential juror because he indicated that he could not give the trial his complete attention was permissible.) Thus, Gaston has failed to demonstrate how the circuit court's decision to remove T.D. constituted error, much less plain error, in this case.
Next, when the State moved to strike S.C., C.A., T.B., and J.D. for cause based on their indication that they could not hold an accomplice liable for the acts of a principal, defense counsel again stated that he had no objection and said, "We agree with that, Your Honor." (R. 641.) According to Gaston, dismissal of these jurors constituted plain error because, he says, they all correctly objected to imposing accessorial liability for capital murder without proof of intent to kill. Although Gaston correctly notes that the prosecutor's hypothetical did not mention proof of intent to kill, Gaston did not object to the hypothetical at trial. Because the State was pursuing a theory of accomplice liability and, given the circuit court's broad discretion in removing jurors for cause, S.C., C.A., T.B., and J.D.'s admissions that they would not be able to find a defendant guilty under the theory of accomplice liability as explained by the prosecutor was an adequate basis for their removal based on bias; their removal did not constitute plain error. For the foregoing reasons, he is not entitled to relief on this issue.
IV.[17]
Gaston argues that the State failed to use its peremptory strikes in a racial- and gender-neutral manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *415 J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Because Gaston did not raise either of these claims at trial, we question whether they are properly before this Court.
This Court has stated:
"[A] review of caselaw indicates that 'both the federal and state courts have consistently held that the failure to make a timely [ Batson or J.E.B. ] objection effectively waives any arguments based on improprieties in jury selection which the defendant might urge pursuant to Batson [or J.E.B. ].' Brian J. Serr & Mark Maney, Racism, Peremptory Challenges and the Democratic Jury: The Jurisprudence of a Delicate Balance, 79 J. Crim. L. and Criminology 1, 19 (1988). The Eleventh Circuit has explained:
" 'In United States v. Rodriguez, 917 F.2d 1286 (11th Cir. 1990), this court recognized that the Supreme Court's Batson [ v. Kentucky, 476 U.S. 79 (1986),] analysis envisioned a "timely objection" and thus held that "an inquiry into the government's exercise of its peremptory challenges is initiated by a defendant's timely objection." Rodriguez, 917 F.2d at 1288 n.4. The failure to make a timely Batson objection results in a waiver of the claim.'
" United States v. Cashwell, 950 F.2d 699, 704 (11th Cir. 1992)."
White v. State, 179 So.3d 170, 198 (Ala. Crim. App. 2013) (questioning whether plain-error review was proper as to White's J.E.B. issue).
Even if, however, the Batson or J.E.B. issues raised by Gaston are subject to plain-error review, Gaston is not entitled to any relief.
" 'To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was "engaged in the practice of purposeful discrimination." ' Blackmon v. State, 7 So.3d 397, 425 (Ala. Crim. App. 2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala. 1987) ). See also Saunders v. State, 10 So.3d 53, 78 (Ala. Crim. App. 2007) ('For an appellate court to find plain error in the Batson [or J.E.B. ] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.').
"In evaluating a Batson or J.E.B. claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed. 2d 931 (2003) :
" 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race [or gender]. [ Batson v. Kentucky,] 476 U.S. [79,] 96-97[, 106 S.Ct. 1712, 1723 (1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral [or gender-neutral] basis for striking the juror in question. Id., at 97-98. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.'
" 537 U.S. at 328-29.
"With respect to the first step of the process-the step at issue here-'[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.' Ex parte Brooks, 695 So.2d 184, 190 (Ala. 1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987) ). 'A defendant makes out a prima facie case of discriminatory jury selection by *416 "the totality of the relevant facts" surrounding a prosecutor's conduct during the defendant's trial.' Lewis v. State, 24 So.3d 480, 489 (Ala. Crim. App. 2006) (quoting Batson, 476 U.S. at 94, aff'd, 24 So.3d 540 (Ala. 2009). 'In determining whether there is a prima facie case, the court is to consider "all relevant circumstances" which could lead to an inference of discrimination.' Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed. 2d 597 (1976) ). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of 'relevant circumstances' to consider in determining whether a prima facie case of race discrimination has been established:
" 'The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
" '1. Evidence that the "jurors in question share[d] only this one characteristic-their membership in the group-and that in all other respects they [were] as heterogeneous as the community as a whole." [People v.] Wheeler, 22 Cal. 3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance, "it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions," Wheeler, 22 Cal. 3d at 280, 583 P.2d at 764, 148 Cal. Rptr. at 905, n.27, indicating that race was the deciding factor.
" '2. A pattern of strikes against black [or female] jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
" '3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks [or females] from the jury venire. Swain [ v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965) ].
" '4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723 ; Wheeler, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
" '5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla. Dist. Ct. App. 1987) ; People v. Turner, 42 Cal. 3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986) ; People v. Wheeler, 22 Cal. 3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
" '6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 355.
" '7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
" '8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks [or females] from the jury.
*417 Batson, 476 U.S. at 93, 106 S.Ct. at 1721 ; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049, 48 L.Ed.2d 597 [ (1976) ].
" '9. The state used peremptory challenges to dismiss all or most black [or female] jurors. See Slappy, 503 So.2d at 354, Turner, supra. '
" Id. at 622-23."
White, 179 So.3d at 198.
Additionally, this Court has previously recognized that:
" 'While disparate treatment is strong evidence of discriminatory intent, it is not necessarily dispositive of discriminatory treatment. Lynch [v. State ], 877 So.2d [1254] at 1274 [ (Miss. 2004) ] (citing Berry v. State, 802 So.2d 1033, 1039 (Miss. 2001) ); see also Chamberlin v. State, 55 So.3d 1046, 1050-51 (Miss. 2011). "Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual." Lynch, 877 So.2d at 1274 (quoting Berry [v. State ], 802 So.2d [1033] at 1040 [ (Miss. 2001) ] ).
" Hughes v. State, 90 So.3d 613, 626 (Miss. 2012).
" ' "As recently noted by the Court of Criminal Appeals, 'disparate treatment' cannot automatically be imputed in every situation where one of the State's bases for striking a venireperson would technically apply to another venireperson whom the State found acceptable. Cantu v. State, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). The State's use of its peremptory challenges is not subject to rigid quantification. Id. Potential jurors may possess the same objectionable characteristics, yet in varying degrees. Id. The fact that jurors remaining on the panel possess one of more of the same characteristics as a juror that was stricken, does not establish disparate treatment."
" ' Barnes v. State, 855 S.W.2d 173, 174 (Tex. App. 1993).
" ' "[W]e must also look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury. See Miller-El [v. Dretke ], 545 U.S. [231] at 247, 125 S.Ct. [2317] at 2329, [162 L.Ed. 2d 196 (2005) ]."
" ' Leadon v. State, 332 S.W.3d 600, 612 (Tex. App. 2010).
" ' "Potential jurors may possess the same objectionable characteristics, but in varying degrees . Additionally, prospective jurors may share a negative feature, but that feature may be outweighed by characteristics that are favorable from the State's perspective. Such distinctions may properly cause the State to challenge one potential juror and not another."
" ' Johnson v. State, 959 S.W.2d 284, 292 (Tex. App. 1997). "This Court has recognized that for disparate treatment to exist, the persons being compared must be 'otherwise similarly situated.' " Sharp v. State, 151 So.3d 308, 342 (Ala. Crim. App. 2013) (on rehearing).
" ' "The prosecutor's failure to strike similarly situated jurors is not pretextual ... 'where there are relevant differences between the struck jurors and the comparator jurors.'
*418 United States v. Novaton, 271 F.3d 968, 1004 (11th Cir. 2001). The prosecutor's explanation 'does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.' Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74, 163 L.Ed. 2d 824 (2006) (quotation marks and citation omitted)."
" ' Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir. 2009).'
" Wiggins v. State, 193 So.3d 765, 790 (Ala. Crim. App. 2014)."
Luong v. State, 199 So. 3d 173, 191-92 (Ala. Crim. App. 2015). With these principles in mind, we will address each of Gaston's claims in turn.
A.[18]
First, Gaston argues that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson, supra. (Gaston's brief, pp. 85-88.) Here, after a number of veniremembers were disqualified, excused, deferred, or stricken for cause, 49 qualified veniremembers remained-41 were Caucasian, 5 were African-American, 2 were Hispanic, and the race of 1, juror P.H., is not identified in the record. Therefore, the 5 African-American veniremembers constituted 10% of the venire, and the 2 Hispanic veniremembers constituted 4% of the venire.
The State used 2 of its 19 peremptory strikes to remove African-American veniremembers and 1 of its 19 peremptory strikes to remove a Hispanic veniremember from the jury panel. Gaston used 1 of his 18 peremptory strikes to remove an African-American veniremember and 1 of his 18 peremptory strikes to remove a Hispanic veniremember. Gaston's jury consisted of 9 Caucasians, 2 African-Americans, and juror P.H., whose race is not otherwise identified in the record. Therefore, the 2 African-American jurors comprised 16.67% of Gaston's jury.[19] There were no Hispanics on Gaston's jury. At the conclusion of the jury-selection process, neither Gaston's defense counsel nor the circuit court indicated that a Batson violation had occurred. The circuit court asked for both the State's and the defense's approval of the jury, and Gaston's defense counsel responded, "This is our jury, yes, sir." (R. 664.)
On appeal, Gaston claims for the first time that the State's use of its peremptory strikes establishes a prima facie case of discrimination against the African-American veniremembers. Specifically, Gaston argues: (1) that the State removed a disproportionate number of African-American and Hispanic veniremembers compared to Caucasian veniremembers; (2) the State's request for E.W., an African-American, to be removed was made on the basis of racial discrimination because, Gaston says, the State admitted to having no cause to remove E.W.; and (3) similarly situated African-American, Hispanic, and Caucasian veniremembers were treated differently. (Gaston's brief, pp. 85-88.)
1.
First, we disagree with Gaston's argument that the statistical evidence supports his claim of a prima facie case of racial discrimination. (Gaston's brief, pp. 85-86.) As noted above, the African-American veniremembers constituted 10% of the venire, *419 and, after the State and Gaston exercised their peremptory strikes, African-American jurors constituted 16.67% of the final jury. Likewise, the Hispanic veniremembers constituted 4% of the venire, and after the State and Gaston each used their peremptory strikes, there were no Hispanics on Gaston's jury. Although the State used 2 of its 19 peremptory strikes to remove 2 of the 5 African-Americans remaining on the venire and 1 of its 19 peremptory strikes to remove 1 of the 2 Hispanics remaining on the venire after excusals and challenges for cause, that fact does not establish a prima facie case of racial discrimination. See Johnson v. State, 823 So.2d 1 (Ala. Crim. App. 2001) (holding State's use of six peremptory strikes to remove six of nine African-American veniremembers insufficient to establish a prima facie case of racial discrimination); Scheuing v. State, 161 So. 2d 245, 260 (Ala. Crim. App. 2003) ("Here, the State's use of peremptory strikes to remove 8 of 12 African-American veniremembers does not raise an inference of racial discrimination.").
2.
Second, we also disagree with Gaston's argument that the State's request for the removal of E.W., an African-American, from Gaston's jury in the middle of trial supports a finding of racial discrimination. (Gaston's brief, p. 86.) As discussed in more detail in Part X of this opinion, the State asked the court to remove E.W. from the jury in the middle of the trial after E.W. made the court aware that his mother was related to one of Gaston's relatives. After hearing arguments from both the State and the defense, the circuit court decided, over Gaston's objection, to make E.W. an alternate. As a result, P.G., an African-American woman, replaced E.W. on Gaston's jury and E.W. became an alternate. Under these circumstances, Gaston has failed to demonstrate an inference of racial discrimination.
3.
Finally, Gaston argues that similarly situated African-American, Hispanic, and Caucasian veniremembers were treated differently. (Gaston's brief, pp. 86-88.) Specifically, he contends that the State struck prospective jurors P.G. and M.M., both of whom were African-American, and prospective juror J.G., a Hispanic male, but did not strike Caucasian prospective jurors who he alleges were similarly situated in a variety of ways. Id. Review of the juror questionnaires and the transcript of voir dire examination does not demonstrate that the prosecutor engaged in disparate treatment when he struck those African-American and Hispanic veniremembers.
Based on our thorough review of the voir dire examination and the juror questionnaires, we find no inference that the prosecutor engaged in purposeful discrimination toward African-American or Hispanic veniremembers. Therefore, we find no plain error.
B.[20]
Gaston argues that the State used peremptory strikes against women in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that this Court should remand the case for a hearing to determine whether the State can offer gender-neutral reasons for those strikes. (Gaston's brief, pp. 78-84.)[21] According to Gaston, only two women *420 were selected to serve on his final jury, which, he says, is evidence of gender discrimination requiring a J.E.B. hearing. (Gaston's brief, pp. 78-79.) Once again, because Gaston did not raise this issue at trial, we will review it for plain error. See Rule 45A, Ala. R. App. P.
Here, as noted in Part IV.A., supra, after a number of veniremembers were disqualified, excused, deferred, or stricken for cause, 49 veniremembers remained. Of those 49 veniremembers, 20 were female and 29 were male. Therefore, the 20 female veniremembers constituted 41% of the venire. The State used 12 of its 19 peremptory strikes to remove female veniremembers. Gaston used 6 of his 18 peremptory strikes to remove female veniremembers. Gaston's jury originally consisted of 2 female members. In the middle of trial, however, juror E.W. was removed and replaced by alternate juror P.G., who was an African-American female. This brought the total number of female veniremembers on Gaston's jury to 3. As a result, females constituted 25% of Gaston's jury. At the conclusion of the jury-selection process, neither Gaston's defense counsel nor the circuit court indicated a J.E.B. violation had occurred.
On appeal, Gaston argues that the State's use of peremptory strikes established a prima facie case of discrimination against the female veniremembers. Specifically, Gaston argues: (1) that the State's use of 12 of its peremptory strikes to remove women from the venire supports an inference of discrimination; (2) that similarly situated male and female veniremembers were treated differently; and (3) that the female veniremembers the State struck were as heterogeneous as the women in the community as a whole and that, therefore, the female veniremembers who were struck shared gender as their only common characteristic.
1.
First, we disagree with Gaston's contention that the State's use of 12 of its peremptory strikes to remove women from the venire supports an inference of discrimination. As noted above, the female veniremembers constituted 41% of the venire, and, after the State and Gaston exercised their peremptory strikes and juror E.W. was removed midtrial, women constituted 25% of Gaston's jury. Although the State used 12 of its 19 peremptory strikes to remove 12 of the 20 women remaining on the venire after excuses and challenges for cause, this fact does not establish a prima facie case of racial discrimination. See Largin v. State, 233 So.3d 374, 402 (Ala. Crim. App. 2015) (holding that State's use of 22 of 29 strikes against female veniremembers did not raise an inference of discrimination).
2.
Second, we also disagree with Gaston's argument that similarly situated male and female veniremembers were treated differently to an extent that indicates discrimination. Gaston argues that the State struck female prospective jurors J.F., J.R., and P.G., but did not strike male prospective jurors who provided similar answers to certain questions on the jury questionnaires.
Based on our thorough review of the voir dire examination and the juror questionnaires, we find no inference that the *421 prosecutor engaged in purposeful discrimination toward prospective jurors J.F. and J.R. Thus, Gaston's allegations of disparate treatment as to those prospective jurors is without merit.
With regard to P.G., Gaston argues that, "[l]ike the majority of male jurors not struck by the prosecution, P.G. identified as pro-death penalty," "had no personal criminal history, had never had an unpleasant experience involving law enforcement, and had never been the victim of a crime." (Gaston's brief, p. 81.) We note, however, that P.G. was originally chosen to serve as an alternate but was later put on Gaston's final jury in place of E.W. (R. 662, 1996.) Thus, Gaston's allegation of disparate treatment as to P.G. is without merit.
3.
Finally, Gaston argues that the female veniremembers the State struck were as heterogeneous as the women in the community as a whole and that, therefore, the female veniremembers who were struck shared gender as their only common characteristic. (Gaston's brief, pp. 82-84.) This Court recognized in McCray v. State, 88 So.3d 1, 20 (Ala. Crim. App. 2010), that
"there is almost always going to be some variance among prospective jurors who are struck; therefore, this alone does not establish heterogeneity of the struck veniremembers so as to support an inference of discrimination. The question, as noted in both Ex parte Branch [, 526 So.2d 609 (Ala. 1997) ] and Ex parte Trawick [, 698 So.2d 162 (Ala. 1997) ], is whether the struck jurors shared only the characteristic at issue, in this case, gender."
Review of the juror questionnaires and the transcript of voir dire examination reflects that many of the women struck shared characteristics other than gender.
Based on our thorough review of the voir dire examination and the juror questionnaires, we find no inference that the prosecutor engaged in purposeful discrimination toward female veniremembers. Therefore, we find no plain error.
V.[22]
Next, Gaston argues that he was denied his right to be present at "all critical stages of the proceedings" because, he says, he was "absent" during a portion of the jury-selection process. (Gaston's brief, pp. 92-97.) Specifically, Gaston contends that, when certain veniremembers were individually questioned as to whether they or anyone close to them had been the victim of a violent crime, he was sitting at counsel table and was unable to hear their responses to certain questions. (Gaston's brief, p. 93.) According to Gaston, as a result, he was forced to "consider potentially biased jurors blindly" and was unable to "meaningfully participate in jury-selection decisions." (Gaston's brief, p. 94.) Because, he says, his constitutional rights were violated, Gaston says that his convictions and sentence are due to be reversed. (Gaston's brief, p. 97.) Neither Gaston nor his counsel objected to his alleged inability to hear the responses of certain veniremembers during voir dire. Additionally, there is nothing in the record indicating that the circuit court thought that this was a problem. Thus, we will review this claim only for plain error. See Rule 45A, Ala. R. App. P.
Rule 9.1(a), Ala. R. Crim. P., provides that a "defendant has the right to be present at the arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions *422 pursuant to Rule 21, the return of the verdict, and sentencing." (Emphasis added.) This right is not absolute, however, and can be waived. See Rule 9.1(b)(1), Ala. R. Crim. P. This Court and the Alabama Supreme Court have previously recognized that, "if a capital defendant is absent from noncritical stages of trial and if his presence would not have benefitted his defense, no error occurs." Jackson v. State, 791 So.2d 979, 1004 (Ala. Crim. App. 2000) (internal quotations and citations omitted). " 'Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." ' " Id. (quoting Burgess v. State, 827 So.2d 134, 186 (Ala. Crim. App. 1998) ).
Furthermore, this Court has previously stated:
" ' "A defendant's right to be present at all stages of a criminal trial derives from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed. 2d 353 (1970) ; Hopt v. Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884). This right extends to all hearings that are an essential part of the trial-i.e., to all proceedings at which the defendant's presence 'has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Compare Hopt v. Utah, supra (defendant has right to be present at empaneling of jurors); Bartone v. United States, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed. 2d 11 (1963) (court cannot impose sentence in absence of defendant); with United States v. Howell, 514 F.2d 710 (5th Cir. 1975) ; cert. denied, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed. 2d 105 (1976) (no right to be present at in camera conference concerning attempted bribe of juror); United States v. Gradsky, 434 F.2d 880 (5th Cir.1970), cert. denied, 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed. 2d 151 (1972) (right to presence does not extend to evidentiary hearing on suppression motion.)" ' "
Id. (quoting Harris v. State, 632 So.2d 503, 511 (Ala. Crim. App. 1992), quoting in turn Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982) ).
During voir dire in the present case, veniremembers from the three panels were asked whether they or someone they knew had been the victim of a violent crime. (R. 369; 479; 591.) For each veniremember who indicated that he or she or someone he or she knew had been the victim of a violent crime, defense counsel asked that the veniremembers line up for further questioning. Id. Those veniremembers were never removed from the courtroom during that time. Id. Thereafter, each veniremember individually disclosed his or her experience to the circuit judge, defense counsel, and the prosecution outside the presence and hearing of the jury venire. (R. 370-75; 479-82; 591-96.) Notably, of those nine veniremembers, only two served on Gaston's jury and both indicated during questioning that they could remain impartial despite their prior experiences. Id.
Gaston was present in the courtroom when those discussions took place. He contends, however, that, as he sat at counsel table, he was unable to see or hear the responses and reactions given by each of those nine veniremembers and that this hindered his participation in the jury-selection process because he was "forced to *423 consider potentially biased jurors blindly." (Gaston's brief, p. 94.) We disagree.
The record reflects that Gaston was present during voir dire examination, where he had the opportunity to learn about the members of the jury panel and to assess the potential composition of the jury; he was present during all the challenges for cause; he was present during the State's peremptory strikes and during the defense's peremptory strikes; and he was present when the trial court formally announced the members of the jury at the conclusion of the striking process. Additionally, the record does not indicate that Gaston was denied an opportunity to consult with his counsel during or after voir dire examination regarding his challenges for cause and peremptory strikes. Importantly, nothing in the record indicates that Gaston was somehow prevented from being with his counsel while those discussions took place.
Although we recognize that jury selection is a critical stage of the trial, we fail to see how Gaston was prejudiced by his inability to hear the discussions that were taking place between the circuit judge, certain veniremembers, his defense counsel, and the prosecution, or how the outcome of his trial might have been different if he had been present during those strikes. Under these circumstances, we simply cannot conclude that Gaston's inability to listen to those discussions was error, plain or otherwise.
VI.[23]
Next, Gaston argues that, throughout his trial, the State relied on "improper arguments, evidence, questions, and innuendo, so 'infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process.' " (Gaston's brief, p. 53 (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ).) Specifically, Gaston argues that, during voir dire and the guilt phase, the prosecutor "improperly and repeatedly held himself out as the personal attorney" of the victim and his family and that he repeatedly attacked Gaston's character. (Gaston's brief, pp. 53, 54-57.) According to Gaston, such representations violated his constitutional rights. (Gaston's brief, p. 54.) Gaston did not object to these complained-of comments at trial; thus, we review his claims for plain error only. See Rule 45A, Ala. R. App. P.
A.
This Court has addressed a similar argument in Scheuing v. State, 161 So.3d 245 (Ala. Crim. App. 2013). In that case, the defendant, like Gaston, argued that the prosecutor's comments during voir dire that he represented the victims in that case were improper. Scheuing, 161 So.3d at 287. This Court rejected that argument and stated:
" 'This Court has held that a prosecutor's comments that he or she represented or spoke for the victim's family is not erroneous. "We have held that it is not reversible error for a prosecutor to suggest that he is speaking on behalf of the victim's family. See Slaton v. State, 680 So.2d 879, 906-07 (Ala. Crim. App. 1995), aff'd, 680 So.2d 909 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed. 2d 680 (1997)." Burgess v. State, 723 So.2d [742] at 754 [ (Ala. Crim. App. 1997) ].'
"... In Slaton, this Court instructed that it is not 'reversible error when the prosecutor briefly suggests that he is speaking on behalf of the victim's family.' Slaton v. State, 680 So.2d 879, 906 (Ala. Crim. App. 1995) (citing *424 Henderson v. State, 583 So.2d 276, 286 (Ala. Crim. App. 1990) ).
"In this case, the record demonstrates that the prosecutor's references to representing and speaking for the victims were limited and brief. This Court, therefore, holds that the prosecutor's comments did not rise to the level of plain error."
In the present case, Gaston argues that the following comment made by the prosecutor during voir dire violated his constitutional rights: "I represent Kevin Thompson. And more importantly, I represent his mother, Frances, and his sister, Rena." (R. 322, 431.) The prosecutor's statement that he represented and spoke for Kevin Thompson and his family was limited and brief. Thus, in light of the principles quoted above, the prosecutor's comments did not rise to the level of plain error, and Gaston is entitled to no relief on this claim.
B.
Gaston also argues that the prosecutor improperly attacked his character during the guilt phase of his capital-murder trial through carefully constructed questions to witnesses that, he says, were designed to present evidence that ultimately "smeared" his character. (Gaston's brief, pp. 54-57.) Once again, Gaston did not object to these complained-of comments at trial; thus, we review his claims for plain error only. See Rule 45A, Ala. R. App. P.
First, Gaston argues that testimony from three of the State's witnesses[24] indicating that Gaston had been seen with guns on prior occasions was not only unrelated to the crimes with which he was charged, but also violated the protections of Rule 404(b), Ala. R. Evid., because, he says, that testimony was used to show that he was " 'predisposed toward violence and thus was more likely to have committed the crimes charged.' " (Gaston's brief, p. 55) (quoting Ex parte Woodall, 730 So.2d 652, 663 (Ala. 1998) ).) Gaston's argument, however, ignores the context in which this testimony was given.
For example, when asked if she had ever seen Gaston "with a long gun or some kind of rifle or firearm," Taneshia McLaine testified that Gaston had brought a "long case" to her son's third birthday party. (R. 1232-33.) Additionally, after being asked about Gaston's camouflage-patterned .50 caliber black-powder rifle found in her car that was later identified as the weapon used during the kidnapping and robbery of Kevin Thompson, Taesha Pulliam was then asked if Gaston owned any other firearms. (R. 1269.) She testified that she knew he had a lot of them and that he "just liked guns." (R. 1270.) Finally, when asked whether he knew if Gaston owned firearms, Jamaal Pulliam stated as follows:
"[PULLIAM]: I seen a few of them.
"[PROSECUTOR]: And what kind of firearms did you see?
"[PULLIAM]: Pistol and rifle.
"[PROSECUTOR]: You saw a long gun?
"[PULLIAM]: Yes, ma'am.
"[PROSECUTOR]: Could you describe the long gun for me?
"[PULLIAM]: It was a .50 caliber. I think it was camouflaged, a real big gun."
(R. 1293.)
Under Rule 404(b), Ala. R. Evid.,
"[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, *425 be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
The testimony quoted above does not fit within the parameters of Rule 404(b), Ala. R. Evid. In fact, when viewed in the context of the record, that testimony does nothing more than establish that Gaston owned guns, including the camouflage-patterned .50 caliber black-powder rifle believed to have been used during the kidnapping and robbery of Kevin Thompson. In no way does it establish that Gaston was "predisposed to violence" as prohibited by Rule 404(b), Ala. R. Evid. If anything, it shows that Gaston possessed and even had access to a weapon that was found to have been used in the crimes at issue in this case, which this Court has previously held is permissible. See Jackson v. State, 177 So.3d 911, 926 (Ala. Crim. App. 2014) (holding that " ' "[e]vidence to show that [an] accused owned, possessed, or had access to ... weapons, or any articles with which the particular crime was or might have been committed is relevant ... as is also evidence that he owned or had in his possession weapons with which the crime was or might have been committed prior to, or after, the commission of the crime. On the other hand, evidence of possession by accused of weapons, or various poisons, not in any way connected with the crime charged is inadmissible." ' " (quoting 22A C.J.S. Criminal Law § 611 ) ). Thus, Gaston is not entitled to relief on this claim.
VII.[25]
Gaston argues that the State committed plain error by introducing what he calls "needless, irrelevant, and inflammatory victim-impact evidence at the guilt phase." (Gaston's brief, p. 28.) Gaston specifically argues that the testimony given by Kevin's mother, Frances Curry, and Douglas O'Dell, the principal of Kevin's school, on direct examination was not relevant to the case and was intended to garner sympathy with the jury. (Gaston's brief, pp. 20-34.) According to Gaston, this testimony constituted impermissible guilt-phase victim-impact testimony, and the State's repeated use of such testimony requires reversal of his convictions and death sentence. (Gaston's brief, pp. 34-37.)
Gaston did not object to this testimony in the guilt phase of his capital-murder trial. Thus, we are limited to evaluating this issue under the plain-error standard found in Rule 45A, Ala. R. App. P. See Turner v. State, 924 So.2d 737, 767 (Ala. Crim. App. 2002).
On appeal, Gaston first attacks the entire first segment of the testimony given by Kevin's mother, Frances Curry, in which Curry described Kevin's life and his work. (Gaston's brief, p. 30.) Specifically, he argues that the following excerpts from Curry's testimony constituted impermissible victim-impact testimony:
"[PROSECUTOR:] All right. So, first of all, tell us a little bit about Kevin.
"[FRANCES CURRY:] Kevin was an amazingly wonderful child. He always had a heart for loving family. They were-family was very important to him. I know he was just so good to me *426 and to our family. He tried very hard to always do the right things.
"[PROSECUTOR:] Tell me a little bit about-did Kevin have a sister?
"[FRANCES CURRY:] Yes.
"[PROSECUTOR:] Tell me a little bit about his sister.
"[FRANCES CURRY:] Rena was his heart. She was-I was just blessed with, and I don't know why, but two amazing children, and they just had a bond that not many people have with children that are 10 years apart. She always-he always acted as if he was her dad, and she just naturally accepted it because he just did everything he could for her.
"[PROSECUTOR:] Okay. Tell me a little bit about Kevin's chosen profession. And I'll ask you this way. We had some people during the voir dire that said they knew Kevin from [the] Wal-Mart [department store] and they knew Kevin from [Jacksonville State University], and then Kevin obviously was a teacher at Wellborn. Tell me about his path to an education and his work.
"[FRANCES CURRY:] Well, he graduated from high school. And when he graduated [in] 1999-some kids you have to kind of let them decide for themselves, you know. I talked to him about college, but he really wasn't interested that much. And later on he came to me-he worked at Walmart. He worked at the bank. He also picked up on his off days and worked at Ryan's [restaurant], but that was while he was in college. He came and said if I don't go to school I'm going to do this for the rest of my life. I knew he was ready then. He wasn't able to get Pell grants like a lot of people because he was working and because of his salary. So he had to take a lot of loans, but he didn't give up.
"When he was young he had a hard time, you know, sometimes he was picked at. We didn't have very much but we had a lot of love, and sometimes he would be picked at. He would be called bad and all of those things. They helped mold him. So his first degree was in marketing. I tried to tell him to be a teacher then, but he didn't think that was the profession that was what he was geared for. Then he went back to school and he went in elementary ed.
"As a parent when I saw him in action I was amazed, in his classroom with his students, with the things he come up and talk about, with the things he would do with students, how he always wanted to make them feel better than he was felt-than he felt when he was in school. He was so excited when he first started doing his-when he first went to the school for his practicum that he came home and he said. 'I know how to teach. You don't have to yell at children. You don't have to belittle them and make them feel small. You don't have to talk about their families. You just have to make them feel good about themselves.'
"[PROSECUTOR:] And he taught elementary school at Wellborn?
"[FRANCES CURRY:] Uh-huh (indicating yes).
"[PROSECUTOR:] I'm going to show you a picture in a moment without a tie, but I think it's fitting for you to tell us the story of Kevin's wearing of ties and why that was so important to you.
"[FRANCES CURRY:] Kevin always thought he had to be very professional and that was, you know, a lot of his upbringing. He's never allowed to wear pants down or they had to be on his waist. I didn't care if 10 people could crawl up in the leg of them, but they had to be on his waist and a belt. So this was like his upbringing for him and he always wanted to wear a tie. It surprised *427 me on a picture that I saw that he didn't have on a tie.
"But one day around Christmas, the week they were getting out for Christmas, he said he saw this little kid and he talked to him. He said he was so sharp, tie, suit, you know, dress clothes. He was just really sharp. And he asked him why was he so sharp, and he told him that he wanted to be like him.
"(State's Exhibit Number 4-G was marked for identification.)
"[PROSECUTOR:] I'm going to show you this item that I've had marked as State's Exhibit 4-G. I'm going to ask you if you recognize that man.
"[FRANCES CURRY:] Yes.
"[PROSECUTOR:] And who is that?
"[FRANCES CURRY:] My baby.
"[PROSECUTOR:] Kevin Thompson?
"[FRANCES CURRY:] (Nods head affirmatively.)"
(R. 705-09.)
In addition to the above testimony given by Kevin's mother, Gaston argues that the following testimony given by Douglas O'Dell, the principal at the school where Kevin taught, also constituted impermissible victim-impact testimony:
"[PROSECUTOR:] Okay. And, Kevin Thompson, was he a teacher under your employ [around April 2011]?
"[DOUGLAS O'DELL:] Yes, sir.
"[PROSECUTOR:] Okay. Tell us a little bit about Kevin as you know him.
"[DOUGLAS O'DELL:] Kevin was kind of a blessing. He came to us-we were looking for a third grade teacher. We were interviewing and we were really having a tough decision, and he walked in and handed a resume to me. We interviewed him on the spot and as a committee decided to hire the young man. We offered him a great position, and he worked out really great. We brought him back the next year and were really looking forward to him-he was a great teacher, on his way to being a great teacher."
(R. 745.)
We disagree with Gaston's claim that the testimony quoted above constituted improper victim-impact testimony. Generally, "victim-impact statements typically 'describe [only] the effect of the crime on the victim and his family' and, although relevant to the penalty-phase, are inadmissible in the guilt phase." Wilson v. State, 142 So.3d 732, 784 (Ala. Crim. App. 2010). However, it is well settled that
"such statements 'are admissible during the guilt phase of a criminal trial ... if the statements are relevant to a material issue of the guilt phase.' Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993) ; see also Gissendanner v. State, 949 So.2d 956, 965 (Ala. Crim. App. 2006) (holding that victim-impact type evidence is admissible in the guilt phase if it is relevant to guilt-phase issues). Rule 401, Ala. R. Evid., provides: ' "Relevant evidence" [is any] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' "
Id.
Here, Frances Curry's testimony about Kevin's childhood and his kindness, conscientiousness, dedication to his students and work, and responsible nature was properly admitted during the guilt phase of Gaston's trial to show why his friends and family were insistent that Kevin's disappearance be investigated in the face of hesitance by law enforcement. The same can be said about Douglas O'Dell's testimony about Kevin's being a great employee and the concerns surrounding his failure *428 to show up for work on April 21, 2011. This testimony was admissible in the guilt phase of Gaston's capital-murder trial to establish the events that led to the discovery of the crime and the discovery of Kevin's body. See Wilson, 142 So.3d at 785 (holding that facts establishing that the victim was sick, frail, and reliable were relevant to establish the events that led to the discovery of the crime and the victim's body and did not constitute improper victim-impact testimony). Under these circumstances, Gaston has not established error, much less plain error. Thus, Gaston is not entitled to any relief on this issue.
VIII.[26]
Gaston argues that the circuit court erred by denying his motion to redact 23 statements contained in his interview with police that was played for the jury in which, he says, Lieutenant Clint Parris with the Anniston Police Department made statements that led him to believe that his nontestifying codefendants had accused him of being the one who murdered Kevin Thompson. (Gaston's brief, pp. 43-53.) According to Gaston, those statements were inadmissible hearsay, and the admission of those statements violated his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution. Id. For the reasons provided herein, we disagree.
Before trial, Gaston moved to redact certain portions of his recorded statement to law enforcement on the basis that certain portions of his statement constituted hearsay and violated his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution. (C. 189.) He further argued that other portions of his statement concerning the fact that he was on probation for unrelated offenses at the time of his arrest violated Rule 404(b), Ala. R. Evid. Id.
Following a hearing on Gaston's motion, the circuit court granted Gaston's motion as it pertained to the statements concerning the fact that he was on probation for unrelated offenses at the time of his arrest. The circuit court denied the portions of Gaston's motion pertaining to the allegations that Gaston said police led him to believe that his nontestifying codefendants had made against him. (R. 292.) When the State sought to introduce Gaston's statement during trial, Gaston renewed his objection, and the circuit court chose to adhere to its original decision. (R. 1681-82.) Gaston challenges that denial on appeal.
It is well settled that
" '[t]he admission or exclusion of evidence is a matter within the sound discretion of the trial court.' Taylor v. State, 808 So.2d 1148, 1191 (Ala. Crim. App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001). 'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala. Crim. App. 1998)."
Hinkle v. State, 67 So.3d 161, 164 (Ala. Crim. App. 2010). Additionally, when faced with the issue Gaston now raises on appeal, this Court has previously stated:
" 'The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." '
*429 Crawford v. Washington, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed. 2d 177 (2004). Thus, 'the Sixth Amendment [prohibits the admission of] testimonial hearsay [statements offered for the truth of the matter asserted], ... and interrogations by law enforcement officers fall squarely within that class.' Crawford, 541 U.S. at 53, [124 S.Ct. 1354] ; see also Id. at 59 n.9 [124 S.Ct. 1354 ]; (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed. 2d 425 (1985) (explaining that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted') ). Similarly, under the Alabama Rules of Evidence:
" ' "Hearsay is not admissible except as provided by [the Alabama Rules of Evidence], or by other rules adopted by the Supreme Court of Alabama or by statute." Rule 802, Ala. R. Evid. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala. R. Evid.'
" Hillard v. State, 53 So.3d 165, 167 (Ala. Crim. App. 2010). Accordingly,
" 'It is well settled that[, when offered for the truth of the matter asserted,] a nontestifying codefendant's statement to police implicating the accused in the crime is inadmissible against the accused; it does not fall within any recognized exception to the hearsay rule and ... [it] violates the accused's confrontation rights. See Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed. 2d 514 (1986) ; Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968) ; R.L.B. v. State, 647 So.2d 803 (Ala. Crim. App. 1994) ; Ephraim v. State, 627 So.2d 1102 (Ala. Crim. App. 1993).'
" Jackson v. State, 791 So.2d 979, 1024 (Ala. Crim. App. 2000). See also Lilly v. Virginia, 527 U.S. 116, 139, 119 S.Ct. 1887, 144 L.Ed. 2d 117 (1999) (holding that the admission of an accomplice's out-of-court confession violated the petitioner's Confrontation Clause rights); Hillard, 53 So.3d at 169 (holding that a codefendant's statement to police was inadmissible hearsay under Rule 802, Ala. R. Evid.)."
Turner v. State, 115 So.3d 939, 943-44 (Ala. Crim. App. 2012).
Here, during Gaston's capital-murder trial, the circuit court admitted a tape of Gaston's statement and allowed the tape to be played for the jury. (R. 1693.) In the taped interrogation, Lt. Clint Parris told Gaston numerous times that his codefendants, Nicholas Smith and Tyrone Thompson, had blamed Gaston for Kevin's murder. According to Gaston, those statements were:
1. "Right now everybody I've talked to is throwing you under the bus .... Tyrone's throwing you under the bus. The guy you seen out there in the car that you said was a little bit drunk, Slick ... [h]e's throwing you under the bus." (Supp. III R. 21.)[27]
2. "Why's everybody been telling me you been trying to get rid of [your gun]?" (Supp. III R. 28.)
3. "You know those two guys you saw in the paper, you know who they're blaming it on? ... You." (Supp. III R. 33.)
*430 4. "Look. Tyrone and Nick are telling me you killed the guy." (Supp. III R. 34.)
5. "What I'm telling you is they're trying to pin a damn murder on you." (Supp. III R. 34.)
6. "Right now we've got the light-skinned guy, who you call Slick Rick or whatever you call him, and we've got Ty right now pointing the finger at you ... Right now they're trying to save their ass ... They've done laid it out there for us." (Supp. III R. 35.)
7. "I have people chomping at the bits ... talking about this case. I got Ty, man. I got Ty laying it out there throwing you right in there with it ... I got Nick-laying it out there throwing you right in there with them." (Supp. III R. 36.)
8. "Why have I got two people who, one that you say don't even know you, why the hell would he tell me, Hey, Dwayne killed somebody?" (Supp. III. R. 40.)
9. "Because I got Nick and Ty-and Tyrone telling me you damn killed somebody trying to save their ass ... They've laid it out here for me ... They-they-they putting both of them there but they saying you the one that killed him. Why would they tell me that, Dwayne? Why?" (Supp. III R. 40.)
10. "I've got two people chomping at the bits to lay it out there on the stand throwing you under the bus." (Supp. III. R. 41.)
11. "Because right now-right now, it's like I just told you, I got two people that are about to damn sit up there on that stand and throw your ass under the bus." (Supp. III R. 41.)
12. "Because they told me you're the one that did it." (Supp. III R. 42.)
13. "Why-why are they telling me you done this?" (Supp. III R. 42.)
14. "Because what they're accusing you of, Dwayne, is some serious ass shit." (Supp. III R. 44.)
15. "Do I think you done this? That's what Tyrone and the light-skinned guy [are] telling me. You're the main culprit. They were just along for the ride." (Supp. III R. 48.)
16. "And right now the light-skinned guy and Tyrone is telling me you the one that done it." (Supp. III R. 49.)
17. "I've got to hear your side of it because right now they're both telling me you." (Supp. III R. 50.)
18. "They're saying, Nick, Ty-or Tyrone Thompson, they're saying you was involved in a way a lot more than them." (Supp. III R. 56.)
19. "Why are they saying you was involved in this at all, Dwayne? What benefit is it for them to say this shit?" (Supp. III R. 65.)
20. "They're saying you're involved, man." (Supp. III R. 65.)
21. "Dwayne, they're saying you did certain things." (Supp. III R. 65.)
22. "Tyrone and Nick's throwing you under the damn bus." (Supp. III R. 83.)
23. "Tyrone and Nick's ... they're the one telling us you damn killed the kid. They're saying you killed Kevin. That's what they're saying, Dwayne killed Kevin." (Supp. III R. 83.)
(Gaston's brief, pp. 45-46.)
Gaston relies on this Court's decision in Turner v. State, 115 So.3d 939 (Ala. Crim. App. 2012), to support his contention that the admission of the aforementioned statements by Lt. Parris constituted reversible error. In Turner, this Court stated:
"Here, the State offered evidence establishing that Turner's accomplices gave confessions to police officers and, in those confessions, stated that, during *431 the commission of the crime, Shah 'grabbed the phone[, and Turner] said f*** this and ... shot [Shah].' ... The State also offered evidence that the accomplices told the police officers that Turner murdered Shah. The confessions of Turner's accomplices to police officers were, without a doubt, testimonial. ... Further, during closing arguments, the State used the accomplices' statements to show that Turner intended to kill Shah. ... The State's use of the accomplices' statements during closing argument leaves no room to doubt that the statements were offered for the truth of the matter asserted."
Turner, 115 So.3d at 944 (citations omitted). The circumstances in this case are distinguishable from those in Turner.
During both the hearing on Gaston's motion to redact and Gaston's trial, Lt. Parris testified that, when he interviewed Gaston on April 26, 2011, neither Nicholas Smith nor Tyrone Thompson had implicated Gaston in Kevin's murder. (R. 154-55, 1657, 1698-99.) When asked about his decision to repeatedly tell Gaston that Thompson and Smith had accused him of killing Kevin, Lt. Parris admitted that those statements were false but that he had chosen to use those deceptive interview practices in an effort to get Gaston to confess. (R. 161, 1698-99.) Lt. Parris further stated that Smith did not implicate Gaston until Smith was interviewed on April 27, 2011, more than six days after Gaston was interviewed by police. (R. 1662-64.)
Under these circumstances, this case is clearly distinguishable from Turner. Unlike Turner, in which the police officers confronted Turner with the actual confessions of his codefendants, here Lt. Parris clearly stated that no such confessions actually existed. Additionally, Lt. Parris's statements were not hearsay because they were not offered to prove the truth of the matter asserted; rather, the statements were offered to elicit a confession from Gaston. This Court has considered statements similar to those made by Lt. Parris and has held:
"The references in Revis's interrogation to the statements of his uncle and brother were harmless error, if error at all. The investigators' allusions to a statement by Revis's uncle were a tactic used to elicit a confession from Revis and were interwoven in Revis's confession. These references were introduced to explain the circumstances of the confession and could be considered by the jury in weighing Revis's statements."
Revis v. State, 101 So.3d 247, 277 (Ala. Crim. App. 2011). Finally, "[n]either [Tyrone Thompson] nor [Nicholas Smith] testified ... nor were any statements made by them received into evidence; thus, [Gaston] had no right to confront or to cross-examine either of these two individuals." D.R.H. v. State, 615 So. 2d 1327, 1330 (Ala. Crim. App. 1993). Thus, Gaston is not entitled to relief on this issue.
In addition to the argument made above, Gaston also argues that the jury's repeated exposure to lies about the allegations of Gaston's codefendants renders his sentence unreliable and warrants reversal. (Gaston's brief, p. 53.) This claim fails to satisfy the requirements of Rule 28(a)(10), Ala. R. App. P.
In its entirety, Gaston's argument is as follows:
"Parris admitted the codefendant allegations amounted to lies and deception. R. 154-55, 1698-99. At a minimum, thus, Gaston's death sentence must be reversed because these false codefendant allegations denied Gaston his rights to a reliable sentencing determination and due process."
*432 (Gaston's brief, p. 53.) Rule 28(a)(10), Ala. R. App. P., requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." "[W]e are not required to consider matters on appeal unless they are presented and argued in brief with citations to relevant legal authority." Zasadil v. City of Montgomery, 594 So.2d 231, 231 (Ala. Crim. App. 1991).
Gaston's argument here is nothing more than a bare allegation. Although he cites two United States Supreme Court cases in a footnote for this claim, he provides no discussion as to how those cases are relevant or how they support his argument. Thus, Gaston's argument here does not comply with Rule 28, Ala. R. App. P., and he has not demonstrated that he is entitled to relief.
IX.[28]
Gaston argues that the circuit court erred when, he says, it "closed" the courtroom twice during his trial, in violation of his Sixth Amendment right to a public trial under the United States Constitution. (Gaston's brief, pp. 89-92.) According to Gaston, the circuit court first closed the courtroom during Agent James Wigley's testimony and again when the State published Gaston's statement to the police to the jury. (Gaston's brief, pp. 89-91.) Gaston contends that, even though those closures were partial, the circuit court held no hearing and made no findings whatsoever to justify the closures. (Gaston's brief, p. 91.) As a result, Gaston contends, his convictions and sentence are due to be overturned. (Gaston's brief, pp. 91-92.) This claim was raised for the first time on appeal; thus, we will review it for plain error. See Rule 45A, Ala. R. App. P.
The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a public ... trial." Likewise, Article I, § 6, of the Alabama Constitution of 1901, guarantees that "in all criminal prosecutions, the accused has a right to ... a speedy, public trial." The Alabama Supreme Court has recognized that "[a] public trial ensures that the judge, prosecutor, and jury carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury." Ex parte Easterwood, 980 So.2d 367, 372 (Ala. 2007) (citing Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed. 2d 31 (1984) ). Although the right to an open and public trial serves important interests, that right is not absolute. See Smith v. State, 213 So.3d 327, 336 (Ala. Crim. App. 2011).
In fact, the Alabama Supreme Court has previously held that "[t]he general rule throughout the country is that an accused may waive this right [to a public trial] expressly or by failing to object." Wright v. State, 340 So.2d 74, 79 (Ala. 1976). We, too, have previously held that, when a defendant fails to object to a trial judge's decision to exclude the public from any segment of the defendant's criminal trial, that failure constitutes a waiver of the right to a public trial. See Fisher v. State, 480 So.2d 6, 7 (Ala. Crim. App. 1985).
Gaston contends that the circuit court violated his right to a public trial in at least two instances. First, he contends that the circuit court violated his right to a public trial during Agent Wigley's testimony. The record shows that, during Agent Wigley's testimony, the circuit judge stopped the proceedings and made the following statement:
*433 "THE COURT: Hold on for a second. What's happening out there?
"THE BAILIFF: It's a forensic class. They were scheduled for another court. They was wanting to know if they could come in here.
"(Off-the-record discussion.)
"THE COURT: I apologize for interrupting. Let's go."
(R. 1404.) Nothing in the circuit judge's statement above demonstrates that the judge intended to exclude the public from the trial proceedings. Even if the circuit judge had done so, however, Gaston's argument still fails because, as Gaston concedes in his brief, he made no objection at that time. (Gaston's brief, p. 91.)
Second, Gaston contends that the circuit court violated his right to a public trial when, he says, the judge permitted a partial closure of the courtroom when the State was preparing to play for the jury a recording of his statement to law enforcement. The record shows that, prior to the State's publishing that statement to the jury, the circuit judge made the following statement:
"THE COURT: Now, you folks in the courtroom, my thoughts are this statement is approximately three hours, right at 40 minutes or three hours and 45 minutes long or the video is. I'll probably take a break about halfway through. So those of you in the courtroom I'm going to drop these lights but let's-if you're going to stay here, let's don't run in and out of the doors. Okay? If you're sitting in the courtroom and you're going to listen to the statements, we're going to take a break. And when we take a break, y'all can take a break. Let's don't have a lot of back and forth.
"I'm about to lock those doors probably unless Mr. Larry sees somebody out there that really wants to come in. But I just don't want a lot of back and forth during opening and closing. So either side if y'all are going to come and go let's get it done and be over with. Y'all can take breaks when we take breaks. Okay? You can probably lock it. I'll let you open it at your discretion, Mr. Larry."
(R. 1690-91.) Although the circuit judge clearly intended to have the courtroom locked while Gaston's statement was being played for the jury, we do not agree with Gaston that the judge's decision to do so violated Gaston's right to a public trial. In fact, this Court has previously held that "an order to lock the door for such an interval as to prevent disruption in the courtroom is properly a matter for the trial court's discretion and does not prevent a public trial in the sense of constitutional requirements." Davidson v. State, 591 So.2d 901, 903 (Ala. Crim. App. 1991). Moreover, Gaston's argument here fails once again because, as Gaston concedes in his brief, he made no objection at that time. (Gaston's brief, p. 91.) Under these circumstances, Gaston has not demonstrated error, much less plain error, and he is entitled to no relief on this claim.
X.[29]
Gaston argues that the circuit court erred by permitting a midtrial "peremptory strike" of E.W. because, he says, Alabama law does not allow a "belated strike of a juror." (Gaston's brief, pp. 74-77.) Gaston further argues that E.W. never should have been removed from his jury because, after E.W. revealed that his mother was distantly related to one of Gaston's unidentified relatives, the court asked whether he could remain impartial, and he stated that could. Id. According to Gaston, removing E.W. violated his rights *434 to a fair and impartial jury under Alabama law and to due process and equal protection under the Sixth and Fourteenth Amendments to the United States Constitution. (Gaston's brief, p. 77.)
On the morning of the third day of trial, the circuit judge noted on the record that E.W. had mentioned that one of Gaston's family members was distantly related to E.W.'s mother. (R. 1215-16.) The following exchange then occurred:
"THE COURT: Now, did you know-you didn't know that before you started-until you started looking out there?
"[E.W.:] Right, cause I didn't know him.
"THE COURT: Cause you didn't know Mr. Gaston?
"[E.W.:] Right.
"THE COURT: Okay. Now do you all want me to ask the questions or do y'all want to ask them?
"[DEFENSE COUNSEL:] Either way.
"THE COURT: Okay. Knowing or having identified some distant relationships, is that going to have any bearing or impact on your ability to sit as a juror and be fair and impartial concerning the rest of this trial?
"[E.W.:] No, sir.
"THE COURT: And you remember all the questions that both sides asked you regarding, you know, being able to bring a verdict and then being able to bring a verdict regarding death penalty phases. This is a capital murder case.
"[E.W.:] Right.
"THE COURT: And it involves the potential death penalty and, you know, without tiptoeing around that issue you understand that-
"[E.W.:] Uh-huh (indicating yes).
"THE COURT: -you know, this side is going to be calling upon you to bring the most severe penalty, as they typically would do in a capital murder case, and they're going to be fighting just as badly-hardly the other way. You understand that?
"[E.W.:] Right.
"THE COURT: And the fact that you may have some long-distance relationship through your mother through some family member of Mr. Gaston in this case, is that going to have any impact at all-
"[E.W.:] No.
"THE COURT: -on your ability to be fair and impartial-
"[E.W.:] No.
"THE COURT: -to both the State of Alabama and to Mr. Gaston?
"[E.W.:] No.
"THE COURT: You won't find yourself leaning one way? You're going to just take the evidence, deal with it, make your own decision about what you think is right?
"[E.W.:] Right. That's the right thing to do.
"THE COURT: Okay. Nobody has approached you or anything like that, tried to contact you-
"[E.W.:] No.
"THE COURT: -communicate with you in any shape, form-and this was something you weren't aware of earlier in the trial?
"[E.W.:] Right.
"THE COURT: Just about the end of the second day I think you realized that maybe there's somebody out there that you knew?
"[E.W.:] Right.
"THE COURT: Do y'all want to follow up with a question?
*435 "[DEFENSE COUNSEL:] I have no follow-ups.
"[PROSECUTOR:] No, sir.
"THE COURT: Okay. Y'all both satisfied that it's okay to continue to sit and serve as a juror in this case? You satisfied that he-
"[PROSECUTOR:] Yes, sir.
"THE COURT: -meets the qualifications of fair and impartiality as far as the case is concerned?
"[DEFENSE COUNSEL:] Yes, sir.
"THE COURT: Okay. Good. All right. Thank you."
(R. 1216-19.) At that point, E.W. was allowed to remain on Gaston's jury.
After lunch, however, the State moved to remove E.W. from the jury after having time to confer with Kevin Thompson's family. (R. 1378.) Specifically, the State argued:
"Judge, the State would just argue that had we known about the potential knowledge of the family we certainly would have chosen to strike that individual. We didn't strike anybody in his category and certainly would have had the ability to strike and so we're learning late. We didn't bring that to his attention or ask him any questions cause I don't want to exacerbate the problem, but I think we're in the same position that the defense would be in if they encountered the same thing. We obviously feel like, despite his comments to the contrary, that it would cause him a problem. And what I would ask the Court to do is simply substitute him for one of the alternates and not draw more attention to it than is necessary and move forward."
Id. In response, Gaston's defense counsel stated:
"Your Honor, we would object to any change to the jury as it stands with our 12 jurors and our two alternates. The juror in question was questioned thoroughly by the Court, indicated that he would have no issue of being fair or impartial, even in light of the questions the court posed him regarding the potential punishment or penalty phase of this trial that could involve the possibility of giving consideration to the death penalty as an appropriate punishment. He still said he could be fair and impartial. With that in mind it appears that he is still qualified to sit, and we would object to any change."
(R. 1378-79.) After hearing these arguments, the circuit judge decided to reserve ruling on the issue. (R. 1379.) He ultimately decided, however, to replace E.W. with an alternate juror but allowed him to remain as an alternate juror. (R. 1996-97.) The defense renewed its objection to removing E.W. (R. 1997.)
This Court has previously analyzed a similar claim under the provisions of § 12-16-100(c), Ala. Code 1975. Subsection (c) allows the trial court, at its election, to use the alternate "if it becomes necessary for an alternate to replace a principal juror." § 12-16-100(c), Ala. Code 1975. When analyzing a circuit court's decision to replace a principal juror with an alternate, this Court has stated:
" 'Whether it is necessary for an alternate juror to replace a principal juror under § 12-6-100(c), as amended, Code of Alabama 1975, is a decision within the sound discretion of the trial judge, subject only to review for an abuse of discretion.' Rocker v. State, 443 So.2d 1316, 1320 (Ala. Cr. App. 1983) (citations omitted).
" 'As for the judge's decision that the circumstances are such that a juror must be excused and replaced by an alternate or additional juror, the judge has considerable discretion *436 here as well. Despite the fact that there are circumstances in which the defendant has a "right to have his trial completed by a particular tribunal," the judge's action in excusing a juror will be upheld "if the record shows some legitimate basis for his decision." This is because the defendant has still been tried by 12 persons selected by him, with even those originally designated as alternates being selected in the same fashion as the other jurors.'
" 3 W. LaFave & J. Israel, Criminal Procedure § 21.3(e), p. 742 (1984) (footnotes omitted)."
Thomas v. State, 615 So.2d 141, 143 (Ala. Crim. App. 1992).
In the present case, when questioned about the connection between his mother and Gaston's family, E.W. indicated that he believed he was distantly related to Gaston through his mother who, he said, was related to an unidentified member of Gaston's family. As such, we believe that the circuit court, which had the opportunity to observe E.W.'s demeanor during questioning, was presented with a situation where removal of E.W. was within the circuit court's considerable discretion. Although we acknowledge that E.W. indicated he could be impartial and render a fair verdict, Gaston has failed to demonstrate how the circuit court's decision to replace E.W. with an alternate juror midtrial constituted a clear abuse of discretion. Thus, he is not entitled to relief on this claim.
XI.[30]
Gaston contends that the circuit court erred when it denied his motion for a judgment of acquittal because, he says, the State failed to present legally sufficient evidence showing that he participated in Kevin Thompson's murder either as a principal or as an accomplice. (Gaston's brief, p. 15.) Specifically, Gaston argues that the State's evidence was insufficient to show either that he was the one who killed Kevin or that he shared his codefendants' intent to kill by assisting them in Kevin's murder. (Gaston's brief, pp. 15-27.) Therefore, Gaston contends, the Eighth Amendment bars his execution here, and his case should be remanded for a judgment of felony murder. (Gaston's brief, p. 27.)
Generally, this Court reviews the denial of a motion for a judgment of acquittal by determining whether, at the time the motion was made, there existed legal evidence from which the jury, by fair inference, could have found the defendant guilty beyond a reasonable doubt. See Mims v. State, 816 So.2d 509, 512 (Ala. Crim. App. 2001). It is well settled that:
" 'in determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala. Cr. App. 1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala. 1985).
" '....
" ' "The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment *437 are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed. 2d 358 (1960).' Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala. Crim. App. 1985) ].
"... 'Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed. 2d 288 (1975). 'Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala. Cr. App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017 (Ala. Crim. App. 1989). Also,
" '[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. Ward v. State, 557 So.2d 848 (Ala. Cr. App. 1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala. Cr. App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).'
" Ward [v. State], 610 So. 2d [1190], at 1191-92 [ (Ala.Crim.App. 1992) ]."
Lockhart v. State, 715 So.2d 895, 899 (Ala. Crim. App. 1997). With these principles in mind, we address each of Gaston's claims on appeal.
A.
Gaston first contends that the circuit court erred in denying his motion for a judgment of acquittal because, he says, the State failed to present sufficient evidence demonstrating that he participated as either a principal or an accomplice in Gaston's murder. (Gaston's brief, pp. 16-27.) According to Gaston, the State failed to prove either that he was the one who killed Kevin or that he did anything to aid and abet Nicholas Smith and Tyrone Thompson when they stabbed Kevin. (Gaston's brief, pp. 16-24, 24-27.) As demonstrated below, however, there was sufficient evidence from which the jury could convict Gaston under an accomplice-liability theory. Thus, we need not address whether the State provided sufficient evidence of Gaston's involvement as a principal.
Gaston was indicted for capital murder committed during the course of a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and capital murder committed during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. To sustain convictions for both of those capital offenses under § 13A-5-40(a), Ala. Code 1975, the State was required to prove beyond a reasonable doubt that Gaston committed an "intentional *438 murder," as that term is defined by § 13A-6-2(a)(1), Ala. Code 1975, during the course of a kidnapping in the first degree, as defined by § 13A-6-43(a), Ala. Code 1975, and during the course of a robbery in the first degree, as defined by § 13A-8-41, Ala. Code 1975. See § 13A-5-40(a)(1) and (a)(2), Ala. Code 1975.
Initially, we note that, at trial, Gaston did not dispute that there was sufficient evidence to show that he and his codefendants kidnapped and robbed Kevin while Gaston was armed with a camouflage-patterned .50 caliber rifle. (R. 2025-27, 2050-51, 2053-54.) In fact, Gaston admitted his involvement in the robbery and kidnapping to police and even identified himself in a stillshot from the bank security footage that showed him in Kevin's car at the ATM, armed with the rifle as money was being withdrawn from Kevin's bank account. (Supp. III R. 60, 70, 78, 80, 93, 95.) Additionally, on appeal, Gaston does not appear to dispute that Kevin was murdered during the course of the kidnapping and robbery. Thus, our analysis turns first on whether the State proved beyond a reasonable doubt that Gaston committed an "intentional murder" as that term is defined by § 13A-6-2(a)(1), Ala. Code 1975.
Under that statute, a person commits an intentional murder if, "with [the] intent to cause the death of another person, he or she causes the death of that person or of another person." § 13A-6-2(a)(1), Ala. Code 1975. When considering whether the State provided sufficient evidence demonstrating the defendant had the requisite specific intent to kill, this Court has recently stated:
" 'No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.' Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998). However, ' "[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence." ' Seaton v. State, 645 So.2d 341, 343 (Ala. Crim. App. 1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala. Crim. App. 1986) ). Intent ' " 'may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' " ' Farrior v. State, 728 So.2d 691, 695 (Ala. Crim. App. 1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala. Crim. App. 1991), quoting in turn Johnson v. State, 390 So.2d 1160, 1167 (Ala. Crim. App. 1980) ). ' "The intent of a defendant at the time of the offense is a jury question." ' C.G. v. State, 841 So.2d 281, 291 (Ala. Crim. App. 2001), aff'd, 841 So.2d 292 (Ala .2002) (quoting Downing v. State, 620 So.2d 983, 985 (Ala. Crim. App. 1993) ). Indeed, '[w]hether the accused possesses the intent to cause the death of another person is a matter to be determined by the jury.' Paige v. State, 494 So.2d 795, 796 (Ala. Crim. App. 1986)."
Morton v. State, 154 So.3d 1065, 1079-80 (Ala. Crim. App. 2013). "To affirm a finding of a 'particularized intent to kill,' the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill." Gamble v. State, 791 So.2d 409, 444 (Ala. Crim. App. 2000).
In the present case, the circuit court gave the following jury instruction with regard to the element of intent for the offense of capital murder committed during a kidnapping:
"So the defendant in this case is charged with capital murder, and the law states *439 that an intentional murder committed during kidnapping in the first degree is capital murder. A person commits an intentional murder if he causes the death of another person and in performing the act or acts which causes the death of that person he intends to kill that person. So understand that you must find the defendant himself, Jovon Gaston, intended to cause the death of Kevin Thompson. He must have that individual intent.
"A person commits a kidnapping in the first degree if he abducts another person with intent to accomplish or aid in the commission of any felony or flight therefrom. To convict the state must prove beyond a reasonable doubt each of the following elements of an intentional murder during a kidnapping in the first degree:
"First, that Kevin Thompson is dead.
"Two, that the defendant, Jovon Gaston, caused the death of Kevin Thompson by stabbing him multiple times with a knife or a knifelike instrument or did aid and abet another person or persons in causing said death.
"Three, that in committing the acts which caused the death of Kevin Thompson the defendant intended to kill the deceased or another person. And, again, a person acts intentionally when it's his purpose to cause the death of another person. The intent to kill must be real and specific.
"Number four, that Jovon Gaston abducted Kevin Thompson and that the defendant intended to accomplish or aid in the commission of any felony or flight therefrom and that the murder took place during the kidnapping."
(R. 2079-80; emphasis added.)
The circuit court also gave the following jury instruction with regard to the element of intent for the offense of capital murder committed during a robbery:
"Now, ladies and gentlemen, Count II of the indictment charges the defendant with the offense of murder during robbery in the first degree. The law states that an intentional murder committed during robbery in the first degree is capital murder.
"A person commits intentional murder if he causes the death of another person and in performing the act or acts that caused the death of that person he intends to kill that person.
"A person commits a robbery in the first degree if in the course of committing or attempting to commit a theft he uses force against the person of the owner or any person present with the intent to overcome his physical resistance or threatens the imminent use of force against the person of the owner with the intent to compel acquiescence to the taking of or escaping with the property and in so doing he causes serious physical injury to another person.
"To convict the state must prove beyond a reasonable doubt each of the following elements of intentional murder during a robbery in the first degree:
"First, that Kevin Thompson is dead.
"Two, that the defendant, Jovon Gaston, caused the death of Kevin Thompson by stabbing him with a knife or a knifelike instrument or did aid and abet another person or persons in causing said death.
"That in committing the act that caused the death of Kevin Thompson that Jovon Gaston intended to kill the deceased or another person; that the defendant Jovon Gaston committed or attempted to commit the theft of United States currency; that in the course of committing or attempting to commit a theft or in the immediate flight after the *440 attempt or commission that the defendant either used force or threatened the imminent use of force against the person of Kevin Thompson with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence in the taking of or escaping with the property; and that the murder took place during the robbery."
(R. 2083-84; emphasis added.)
Section 13A-2-23, Ala. Code 1975, Alabama's accomplice-liability statute, provides, in pertinent part:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"....
"(2) He aids or abets such other person in committing the offense."
In analyzing the role of an accomplice in a capital offense, this Court has recently stated:
" ' "[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer." Price v. State, 725 So.2d 1003, 1055 (Ala. Crim. App. 1997), aff'd, 725 So.2d 1063 (Ala. 1998). "The words 'aid and abet' encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary." Henry v. State, 555 So.2d 768, 769 (Ala. Crim. App. 1989). "The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence." Miller v. State, 405 So.2d 41, 46 (Ala. Crim. App. 1981) (citation omitted). "The jury is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented." Walls v. State, 378 So.2d 1186, 1191 (Ala. Crim. App. 1979). "Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred." Sanders v. State, 423 So.2d 348, 351 (Ala. Crim. App. 1982).'
" Harris v. State, 854 So.2d 145, 151 (Ala. Crim. App. 2002).
" '[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.' Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982)."
Morton v. State, 154 So.3d 1065, 1080 (Ala. Crim. App. 2013) (emphasis added). Importantly, "if the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established." Gamble v. State, 791 So.2d 409, 444 (Ala. Crim. App. 2000) (internal quotations and citations omitted).
In the present case, Gaston admitted to police that he played the part of gunman when Kevin was forced from his apartment around 10:30 p.m., driven to multiple ATMs, and forced to withdraw money. (R. 1835-36; Supp. III R. 95.) Even after Kevin's debit card was declined, Gaston remained with Tyrone and Smith, waited at Tyrone's house until after midnight, then rode with them as the trio attempted to use the debit card once more. (C. 318-23; R. 948, 953-55; Supp. III R. 80-82, 85.)
*441 Gaston even remained with the men as Smith purchased duct tape at a gas station. (R. 1664-65, 1670, 1987.)
Importantly, Gaston also told the police that the men drove out of town and stopped near a guardrail on "[s]ome black dark ass road," turned off the headlights, and parked. (Supp. III R. 75, 84, 87.) According to Gaston, as he sat in Smith's Ford Explorer sport-utility vehicle, he saw Smith and Tyrone remove Kevin from the trunk of Kevin's car, which was parked "down the road." (Supp. III R. 84.) He further told law enforcement that he saw Smith and Tyrone "tussle" with Kevin, hitting Kevin several times. (Supp. III R. 88, 91.) Although he claimed to be a distance away, Gaston admitted to police that he saw Kevin's face and heard him scream when Smith stabbed him. (Supp. III R. 83-85.) During the four-hour period between Kevin's abduction and his murder, Gaston remained with Tyrone and Smith and never once attempted to render aid to Kevin.
In viewing the above evidence in the light most favorable to the State, we conclude that the evidence was sufficient for the jury to find that Gaston was a willing participant in Kevin's murder. Therefore, the circuit court properly denied Gaston's motion for a judgment of acquittal.
B.
Gaston also argues that the Eighth Amendment bars his execution here because he was not the person who stabbed and killed Kevin. (Gaston's brief, p. 27.) This claim is presented for the first time on appeal; therefore, we will review it only for plain error. See Rule 45A, Ala. R. App. P.
This Court has previously held that the death penalty can be imposed upon a nontriggerman accomplice so long as there is proof that he was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. See Gamble v. State, 791 So.2d 409, 446 (Ala. Crim. App. 2000). "[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer. ... As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt." Price v. State, 725 So.2d 1003, 1055 (Ala. Crim. App. 1997) (citations omitted); see also §§ 13A-2-20 through 13A-2-23 and 13A-5-40(c), Ala. Code 1975.
As established in Part XI.A. of this opinion, supra, the evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that Gaston aided and abetted Tyrone Thompson and Nicholas Smith in killing Kevin Thompson. As such, whether Gaston stabbed Kevin is of no legal consequence. Thus, his death sentence was proper, and his claim here is without merit.
XII.[31]
Gaston argues that the circuit court erred by allowing the State to elicit and argue the opinions of Kevin Thompson's family to persuade the jury to recommend a death sentence. (Gaston's brief, pp. 37-43.) Specifically, he argues that the State elicited testimony from Frances Curry, Rena Curry, and Lalika Boyd that improperly characterized Gaston, his crime, and the punishment he should receive. (Gaston's brief, pp. 38-41.) According to Gaston, the State's use of such testimony constituted plain error, and, thus, he says, his death sentence must be reversed. (Gaston's brief, pp. 41-43.) Gaston *442 did not object to that testimony at trial; therefore, this issue will be reviewed for plain error only. See Rule 45A, Ala. R. App. P.
During the penalty phase of Gaston's capital-murder trial, the State called Kevin Thompson's sister, Rena Curry to testify and specifically asked her how she wanted Gaston to be punished. Rena not only testified that she wanted Gaston to be executed, but she also essentially told the jury that, despite the mitigating evidence reflecting that Gaston had a difficult childhood, it was her opinion that Gaston was not thinking about his childhood when he murdered Kevin. Specifically, she stated:
"Jovon Gaston didn't help my brother, but now he's looking at you guys the very same way that my brother looked at him the night his life was taken. He showed Kevin no mercy, and I'm asking all of you to do the same. He drove Kevin's car by himself with Kevin in the trunk, and he never pulled over. He never went to the police station. He never asked anyone for any help. So now I'm asking all of you guys to not pull over, to not go to a police station, and to not ask anyone for help.
"....
"I'm aware that a lot will be said today, I am, but if you guys take anything with you today I want you to keep in mind that Jovon's childhood wasn't at the front of his mind the night my brother died."
(R. 2131-32.)
The State also called Lalika Boyd, Kevin's cousin, to testify and specifically asked her how she wanted Gaston punished. She testified that she wanted Gaston to be executed. When asked by the prosecutor why she wanted Gaston to receive the death penalty, Boyd stated:
"The manner in which Kevin was taken was so heinous. He didn't just die. He was tortured for hours. He died in fear. And it is not fair that today we are supposed to consider someone else's fear when no one considered Kevin's."
(R. 2146-47.)
Finally, the State called Frances Curry, Kevin's mother, to testify and specifically asked her to explain the impact that Kevin's death had on her and how she wanted Gaston to be punished. In response, Curry not only characterized the crime as "torture" but she also gave the following statement:
"My loss is tremendous. ... What I'm about to tell you right now it's not for vengeance and it's not even any hate in my heart but it is for justice. I want the death penalty. Even if he gets it-whatever you guys decide to give, I'm going to appreciate it. But even if he gets it, he gets 30 more years than Kevin was allowed to have. Even if he gets it, he's not going to be tortured the way my son was."
(R. 2149.) Addressing Gaston directly, she then made the following statement:
"You are the monster that kids are afraid of in the night that goes bump in the night. We reassure our kids that there's no monster there, but you are that monster. You walk on two feet. You have two arms, two eyes, a brain to make a decision. And after listening to your record you've had numerous opportunities to have pulled back and done better. I would never change the monster that you are. It won't ever change for me. Only a monster could do what you did and walk around. I refuse to put your name in my mouth with my son."
(R. 2149.) During its penalty-phase closing argument, the State then told the jury that Frances Curry was right that the appropriate punishment for what Gaston did was the death penalty. (R. 2252.)
*443 We addressed a very similar claim on direct appeal for Gaston's codefendant, Nicholas Smith. See Smith v. State, 246 So.3d 1086 (Ala. Crim. App. 2017). In Smith, the defendant argued, just as Gaston does here, that the circuit court erred by allowing the State to elicit and to argue the opinions of Thompson's family to persuade the jury to recommend a death sentence. Id. Specifically, Smith argued that the State improperly elicited testimony from Frances Curry and Rena Curry regarding their characterization of Smith, his crime, and the punishment he should receive. Id.
We reviewed this argument for plain error and found that Smith was correct. We provided the following reasoning in support of our decision:
" 'In Booth v. Maryland, 482 U.S. 496, 502, 107 S.Ct. 2529, 96 L.Ed. 2d 440 (1987), the United States Supreme Court held that a defendant's Eighth Amendment rights were violated by the sentencing authority's consideration of any victim-impact evidence. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed. 2d 720 (1991), the United States Supreme Court partially overruled Booth to allow the sentencing authority to consider evidence of the effect of the victim's death upon family and friends. Payne, 501 U.S. at 830 n.2, 111 S.Ct. 2597 ("Our holding today is limited to the holdings of [ Booth ] ... that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing.").
" 'In Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993), this Court noted that Payne had only partially overruled Booth and that it had left intact the proscription against victim-impact statements containing "characterizations or opinions of the defendant, the crime, or the appropriate punishment." 640 So.2d at 1017. The Court in McWilliams held that a trial court errs if it "consider[s] the portions of the victim impact statements wherein the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment." Id.'
" Ex parte Washington, 106 So.3d 441, 445 (Ala. 2011).
"The appellate courts of this State have found plain error in cases where the family members of the victim were allowed to present in the penalty phase their characterizations or opinions of the defendant, the crime, or the appropriate punishment. For example, in Ex parte Washington, 'the victim's parents told the jury that Washington's crime was "brutal, evil, terrible," that Washington was "someone without a conscience," and that death was the appropriate punishment.' Ex parte Washington, 106 So. 3d at 446. The Alabama Supreme Court held those comments to constitute plain error. In Wimberly v. State, 759 So.2d 568 (Ala. Crim. App. 1999), the stepdaughter of one of the victims read a statement into evidence in which she characterized the defendant as a 'predator,' a 'coward,' and a 'murdering thief'; commented on his remorselessness; described in positive terms the life he would face in prison if he avoided a sentence of death; and asked that the defendant 'be given the sentence that he has handed out: Give him death.' Wimberly, 759 So.2d at 572-73. Reviewing the comments in Wimberly, this Court,
" 'recognize[d] the emotional devastation and loss the family members ... have suffered. Nevertheless, reviewing the remarks made by the family *444 member to the jury during the sentencing hearing, [this Court found that] the cumulative effect of [those] improper comments to be plain error. Had the prosecutor made these same comments in argument, [this Court] would find them to be a textbook example of prosecutorial misconduct. The fact that the these same comments were read to the jury by a bereaved family member only magnifies the impact such comments surely had on the jury as it closed to deliberate on its sentence recommendation. We find that these comments were calculated to incite an arbitrary response from the jury and that they should have been excluded. Barbour v. State, 673 So.2d 461, 469 (Ala. Crim. App. 1994). If [this Court] were not already reversing this case for a new trial, [it] would set aside the sentence and remand this case to the trial court for a new sentencing phase before the jury and a new sentencing hearing before the trial court based on the admission of improper victim impact evidence. Gillespie v. State, 549 So.2d 640, 644 (Ala. Cr. App. 1989).'
" Wimberly v. State, 759 So.2d 568, 573-74 (Ala. Crim. App. 1999).
"Similarly, Frances Curry and Rena Curry provided the jury with their characterization of Smith and his crime, as well as their desire for the jury to recommend a sentence of death. They testified directly to their characterization and/or and opinion of Smith, the crime, and the appropriate punishment. Moreover, the trial court did not instruct the jury on how to consider this victim-impact testimony. In a case with strong mitigation, such as this case, it is not clear that the improper victim-impact testimony had no influence on the jury's recommendation. Therefore, absent assurances that this testimony did not influence the jury in recommending a death sentence, it is necessary to remand this case for a new sentencing proceeding."
Smith, 246 So. 3d at 1116.
In the case now before us, "Frances Curry and Rena Curry provided the jury with their characterization of [Gaston] and his crime as well as their desire for the jury to recommend a sentence of death" just as they did in Smith's case. Their sentiments were underscored by Lalika Boyd, who not only impermissibly characterized the crime as "heinous," but who also implored the jury to sentence Gaston to death because, she said, "it is not fair that today we are supposed to consider someone else's fear when no one considered Kevin's." (R. 2147.) Moreover, like the circuit court in Smith, the circuit court here did not instruct the jury on how to consider this victim-impact testimony. Therefore, it is not clear that the improper victim-impact testimony had no influence on the jury's recommendation. Absent assurances that this testimony did not influence the jury in recommending a death sentence, it is necessary to remand this case for a new sentencing proceeding.[32]
Conclusion
For the foregoing reasons, Gaston's capital-murder convictions are affirmed but his death sentence is reversed, and the cause is remanded with instructions for the circuit court to conduct a new penalty proceeding.[33]
*445 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Welch, J., concurs. Kellum, J., concurs in the result. Windom, P.J., concurs in part and dissents in part, with opinion. Burke, J., concurs in part and dissents as to Part IX.

Kevin Thompson is not related to Tyrone Thompson.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Citations to the transcript of Gaston's statement to police found in the third volume of the supplemental record will be denoted with (Supp. III R. ----.)

A serrated stainless-steel knife with a black plastic handle was recovered from the outdoor trash can where Whitney Ledlow and Jessica Foster lived. (R. 1425.) Forensic testing revealed Kevin Thompson's blood was on the knife. (R. 1928-29.)

At the time of Kevin's murder, Gaston was on probation for second-degree unlawful possession of marijuana, see § 13A-12-214, possession of drug paraphernalia, see § 13A-12-260, Ala. Code 1975, and possession of a pistol without a permit, see § 13A-11-73, Ala. Code 1975, and § 13A-11-84, Ala. Code 1975.

Those aggravating factors were in addition to the aggravating factors established by the jury's guilty verdict: that the murder was committed while the defendant was engaged in a robbery and while the defendant was engaged in a kidnapping, see § 13A-5-49(4), Ala. Code 1975.

Those mitigating circumstances found to exist by the circuit court were Gaston's lack of significant criminal history and his tumultuous childhood. (C. 225-31.)

This claim appears as Issue VI in Gaston's brief.

The State argues that this argument was not raised at trial and thus must be reviewed for plain error. (State's brief, p. 55.) We disagree. Generally,
" 'to preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.' McKinney v. State, 654 So.2d 95, 99 (Ala. Crim. App. 1995) (citation omitted)."
Ex parte Coulliette, 857 So.2d 793, 794 (Ala. 2003). Additionally, "[I]t is familiar law that an adverse ruling below is a prerequisite to appellate review." CSX Transp., Inc. v. Day, 613 So.2d 883, 884 (Ala. 1993).
As discussed in more detail in this section of our opinion, the record contains several pro se letters that Gaston filed with the circuit court in which he expressly asks the court to dismiss his lawyer and to appoint new counsel. In at least two instances, the circuit court denied those requests by order. (C. 99, 120.) Under these circumstances, this argument has been properly preserved for appellate review.

This claim appears as Issue VII in Gaston's brief.

As discussed below, it does not appear that the circuit court ruled on Gaston's first pro se motion for a speedy trial. Further, because Gaston filed both speedy-trial motions pro se while he was represented by counsel, we question whether this claim is preserved for appellate review. Even if it is preserved for review, however, Gaston is not entitled to relief.

The record indicates that Gaston was evaluated in June 2012 (Supp. I C. 10), that forensic reports from both the Alabama Department of Forensic Sciences and the Federal Bureau of Investigation were disclosed in January 2013 (C. 93-94), and that discovery was ongoing until May 2015. (C. 150.) Additionally, Gaston's forensic or psychological assessment and background check were not completed until after June 2015. (C. 151-52.)

Although not clear from the record, it appears that the letter referenced by the prosecutor in this excerpt may be Gaston's pro se letter that he filed with the circuit court and prosecutor in August 2014.

Citations to the clerk's record found in volume one of the supplemental record on appeal will be denoted with "Supp. I. C. ----."

This claim appears as Issue VIII in Gaston's brief.

Those nine veniremembers were T.D., S.C., A.C., T.B., C.A., and J.D. from Panel A, see R. 345-46; C.M. from Panel B, see R. 449; and C.W. and K.S. from Panel C, see R. 560.

Gaston raises these issues as Issues X and XI in his brief. Because Issues X and XI rely on the same principles of law, we address them together.

This claim appears as Issue XI in Gaston's brief.

In the middle of trial, one of the African-American jurors, E.W., was removed and was made an alternate. He was replaced, however, by alternate juror P.G., an African-American female.

This claim appears as Issue X in Gaston's brief.

The United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that it was a violation of the Equal Protection Clause of the United States Constitution for the State to remove a prospective juror from a defendant's jury based solely on the juror's race. In J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court extended Batson to gender-based strikes.

This claim appears as Issue XIII in Gaston's brief.

This claim appears as Issue V in Gaston's brief.

Although not entirely clear, it appears that the quotes and citations in Gaston's brief refer to the testimony of Taneshia McLaine, Taesha Pulliam, and Jamaal Pulliam.

This claim appears as Issue II in Gaston's brief.

This claim appears as Issue IV in Gaston's brief.

The transcript of Gaston's statement to law enforcement is found in the third volume of the supplemental record. References to that transcript will be denoted with "Supp. III. R. ____."

This claim appears as Issue XII in Gaston's brief.

This claim appears as Issue IX in Gaston's brief.

This claim appears as Issue I in Gaston's brief.

This claim appears in Issue III of Gaston's brief.

Our reversal of Gaston's death sentence pretermits any discussion of his remaining issues related to the penalty phase.

Because no return to remand is ordered, this decision is final. See Russell, --- So.3d at ----.